**MOBIL OIL CORPORATION, Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
**Respondent,**

**Public Service Commission of the State**
**of New York, Intervenor.**

**No. 72–1471.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1973.

Decided July 11, 1973.

As Amended July 26, 1973.

---

**1240**

Carroll L. Gilliam, Washington, D. C., with whom Tom P. Hamill, Houston, Tex., and Philip R. Ehrenkranz, Washington, D. C., were on the brief for petitioner.

Joan E. Heimbigner, Atty., F.P.C. with whom Leo E. Forquer, Acting Gen. Counsel, and George W. McHenry, Jr., First Asst. Sol., F.P.C., were on the brief for respondent.

Peter H. Schiff, Gen. Counsel, Public Service Commission of the State of N. Y., Albany, N. Y., Richard A. Solomon and Paul M. Ruden, Washington, D. C., were on the brief, for intervenor.

Before LEVENTHAL and WILKEY, Circuit Judges, and JAMESON,* Senior District Judge for the District of Montana.

WILKEY, Circuit Judge:

This case arises on petition for review of orders of the Federal Power Commission setting minimum rates required to be charged by natural gas pipelines for the transportation of certain liquid and liquefiable hydrocarbons. As a producer of natural gas and other petroleum products required to pay these transportation rates, petitioner challenges their validity on the grounds that (1) the Federal Power Commission has never been granted jurisdiction to establish rates for liquid hydrocarbons; (2) the Commission unlawfully used privileged data submitted as part of an unaccepted settlement proposal in formulating the rates; (3) the Commission violated certain procedural requirements in establishing the rates; and (4) in any case, there is no evidentiary basis for the rates promulgated by the Commission. We find that the Commission does have jurisdiction to establish at least some of the rates involved in this action and that the Commission under certain safeguards could lawfully use the data submitted as a part of an unaccepted settlement proposal. On the record currently before the court, however, we are not able to determine whether the rates have a valid evidentiary basis, nor are we satisfied that the procedure employed by the Commission here met the requisite standard for the objectives the Commission was seeking to accomplish. We

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

therefore set aside the orders of the Federal Power Commission here challenged, and remand for further proceedings.

## I. Background

The mechanics of natural gas production are such that gas and liquid hydrocarbons (*i. e.*, crude oil) are often produced simultaneously from a single well. The gaseous product of the well may also contain some hydrocarbons which, although in a gaseous form when released from the ground, may later be liquefied and treated as a liquid. Thus a single well often produces simultaneously liquid, liquefiable, and gaseous hydrocarbons; the gaseous product is sold at or near the wellheads to interstate pipelines.

The economics of natural gas production often preclude having facilities at each well to separate the three products for individual transportation. Consequently, an interstate natural gas pipeline company may at times transport liquids and liquefiables through a single pipeline, even though it is only interested in purchasing a gaseous product of the well after the original natural product is separated into component parts.

The contractual aspects of natural gas production have evolved with due regard to these natural and economic phenomena. The producer and the pipeline frequently agree that the producer will sell the gas from the well but reserve title to all the liquids and liquefiables transported. The gas pipeline company transports, along with the gas it purchased, various quantities of liquids and liquefiables that are still owned by the producer.

This transportation service constitutes a *value* to the producer, since he must have some way of transporting his oil to the refinery, and a *cost* to the pipeline, since the use of its pipeline capacity to transport oil reduces its ability to transport gas. Thus the rate charged a producer for transporting liquids has a direct effect upon what must be charged for the transportation of gas, if the pipeline is to operate at a profit.

The Federal Power Commission has by statute the duty to establish "just and reasonable" rates for the transportation and sale of natural gas traveling in interstate commerce.[1] Thus

---

1. This responsibility is imposed under sections four and five of the Natural Gas Act. The relevant provisions of that Act are as follows:

Section 4(e). Whenever any such new schedule is filed the Commission shall have authority, either upon complaint of any State, municipality, State commission or gas distributing company or upon its own initiative without complaint, at once, and if it so orders, without answer or formal pleading by the natural-gas company, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the natural-gas company affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect, and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of the suspension period, on motion of the natural-gas company making the filing, the proposed change of rate, charge, classification, or service shall go into effect. Where increased rates or charges are thus made effective, the Commission may, by order, require the natural-gas company to furnish a bond, to be approved by the Commission, to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts were paid, and, upon completion of the hearing and decision, to order such natural-gas company to re-

the Commission clearly has the authority to regulate the transportation charges of gas pipeline companies for natural gas. The statute does not, however, grant the Commission the power to regulate pipeline transportation charges for liquid products.[2]

The ability to regulate transportation rates for gas and arguably liquefiables, but not for liquids, creates an obvious problem. The transportation rates for all three are interrelated; it follows that what are "just and reasonable" rates for natural gas is related to what

fund, with interest, the portion of such increased rates or charges by its decision found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible. 15 U.S.C. § 717c (1970).

The relevant portion of section 5(a) is as follows:

Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine that just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates. 15 U.S.C. § 717d (1970).

2. The Natural Gas Act is completely silent regarding the regulation of liquid petroleum. Aside from the negative conclusion to be drawn from the title, the few remarks in the legislative history regarding liquid petroleum indicate that Congress did not intend the Natural Gas

Act to grant jurisdiction over oil. In the hearings on the bill before a subcommittee of the House Committee on Interstate and Foreign Commerce, the following colloquy took place between Mr. Dozier A. DeVane, Solicitor of the Federal Power Commission, and Representative John G. Cooper of Ohio:

Mr. Cooper. Would you classify oil as a public commodity as a necessity?

Mr. DeVane. I have not done so; no, sir.

Mr. Cooper. It is transported in interstate commerce.

Mr. DeVane. Yes, sir.

Mr. Cooper. And the Federal Government has tried or attempted to regulate the price of that transportation.

Mr. DeVane. It is regulating the price of the transportation.

Mr. Cooper. But does not regulate the price of oil?

Mr. DeVane. It does not regulate the price to the consumer.

Mr. Cooper. Well, a lot of oil is being burned these days, a tremendous lot of oil is being burned, as well as natural gas, and I just was wondering whether any steps are going to be taken to regulate the wholesale price of oil?

Mr. DeVane. I suppose the answer to the question that you raise is that gas sold to the public in every community is a monopoly so far as that community is concerned and it is my opinion that if the oil business was the same, or the coal business was the same, or any other single business, that had a complete monopoly insofar as the consuming public was concerned in any substantial number of communities of the country, that it would be necessary to subject that business to regulation.

My theory of regulation is that it certainly goes with monopoly and in the gas field, as in the electric field, and as in the telephone field, there should be a monopoly in serving communities.

Hearings on H.R. 11662 Before a Subcomm. of the House Comm. on Interstate and Foreign Commerce, 74th Cong., 2d Sess., at 27 (2 April 1936).

are the actual costs and proper charges for transporting liquids and liquefiables. For example, if a pipeline company charges the producer less than the actual cost of transporting liquids and liquefiables, the extra cost must be allocated to the other product being transported, natural gas, with the resulting danger that the consumer of natural gas will be asked to pay this extra transportation cost in the form of higher gas prices.

Between 1954 and 1968 the Federal Power Commission, as the agency obligated to assure that gas rates are "just and reasonable," sought to assure that the costs of transporting liquids and liquefiables were not passed along to gas consumers. It followed the practice of considering the problem on an individual basis when producers applied for certificates to sell natural gas to pipelines or when holding hearings on the reasonableness of pipeline rates. With information as to the type of transportation involved and the contractual arrangement between the producer and the pipeline, the FPC would determine what proportion of transportation costs should be attributed to the transportation of liquids and liquefiables. The Commission would then approve the certificate or rate schedule on the condition that the expenses be appropriately allocated.

■ It is critically important to understand that under this method the Commission was not setting rates that had to be charged for the transportation of liquids and liquefiables by the gas pipelines. It was simply saying that a certain percentage of transportation costs *could not* be charged to the transportation of natural gas. It is clear and no one disputes that the Commission was empowered to do this under its authority to set "just and reasonable" rates for the transportation of natural gas.

## II. *The Commission's Action*

By notice issued 5 February 1968 the Commission announced that it was "contemplating adopting a statement of general policy" providing that the Commission would allocate an appropriate proportion of costs to the transportation of liquids and liquefiables.[3] In essence, this proposal would have formalized the procedure already used to assure that transportation costs attributable to non-gas products were not paid by gas consumers. The notice did not clearly indicate whether the procedure would establish a single uniform proportion applicable to all producers, nor did the notice contain any intimation that the Commission would establish *rates* that pipelines

3. This notice further stated that:
 "We have reached a tentative conclusion that it might be preferable and sufficient for purposes of consumer protection, to allocate out of the cost of service applicable to other jurisdictional services the liquid transportation costs in pipeline cases, leaving it to the pipelines to negotiate fair compensation from the owner of the liquids or the liquefiable hydrocarbons. But before adopting *any* general policy to guide our future actions we believe it advisable to secure the comments of all interested parties."
 The Commission also stated that in the interim, it would condition future producer certificates "involving transportation of producer liquids and/or liquefiable hydrocarbons from off-shore to onshore" upon the outcome of the rulemaking proceeding, and would do so for other proposed sales involving pipeline transportation or producer liquids "if the transportation was substantial distances"
 The Notice included the text of a proposed amendment of the Commission's "General Policy and Interpretations." That proposal stated:
 "In reviewing and determining the costs that are allocable or ascribable to sales by pipeline companies of natural gas for resale or to transportation of natural gas in fixing pipeline rates therefor, the Commission will, *insofar as* the pipeline company transports on shore from offshore for substantial distances liquids, liquefiable hydrocarbons, and related fuel for others, allocate an appropriate portion of transportation costs to such liquids, liquefiable hydrocarbons, etc., regardless of whether the pipeline company has separately charged therefor."
 Notice of Proposed Statement of General Policy, Docket No. R–338, 33 Fed.Reg. 2860–63 (1968).

*must* charge producers for transporting liquids and liquefiables; in fact, the implication was to the contrary. Both omissions, particularly the latter, were of great significance, if in fact the FPC intended to make changes in long-followed regulatory procedures.

In response the Commission received comments from fifteen natural gas producers, including Mobil, eleven pipeline companies, and two state agencies. Only the two state agencies supported the "policy" as proposed.[4]

None of the commenting parties presented any data regarding pipeline costs, distances, or any other facts that would be relevant to determining what proportion of costs should be allocated to the transportation of liquids and liquefiables if the Commission chose to adopt such a policy. No technical, financial or other data were submitted in any form, by affidavits or statement. It is a fair implication from all of this that all parties understood that the proposed rule was designed to determine whether the Commission should at some future time hold proceedings to determine specifically the proportion that would be generally applicable. From the nature of the comments received, it is clear that none of the interested parties felt, at least initially, that the rule-making proceedings then underway would result in allocating an *actual* proportion. There was even less reason for anyone to think that the Commission would set specific rates for the transportation of liquids and liquefiables, since there was no mention of rates in the proposal for rule-making. The interested parties undoubtedly felt that they were commenting on a "general policy"—as it had indeed been described in the published proposal.

No action was taken by the Commission on its proposal for two and one half years. On 10 September 1970 parties who had filed comments were informed that a "conference" had been called by the Commission Staff Counsel on 29 September 1970 to discuss the proposed rule.

An attorney from the Commission's Office of General Counsel conducted this conference. No transcript of this conference was taken, although "minutes" in the form of a paraphrase of the discourse were prepared and distributed later by the FPC staff. The Commission attorney conducting the meeting stated that the FPC staff was at a "disadvantage" because the "comments" "did not contain any substantial factual data."[5] To remedy this, the parties were asked to "develop factual data" on the issue. It was noted that transportation charges of the sort in issue were involved in the Southern Louisiana area rate proceeding that was currently under way. The parties agreed to adjourn this initial conference to await the outcome of settlement meetings being conducted in the Southern Louisiana case. All parties clearly understood that this was an exploratory meeting and that additional notice would be given if the nature of the proceedings changed.[6]

4. The disagreement on the portion of the proposal involved here fell into six distinct categories: (1) Rates for transportation of liquefiable hydrocarbons could not be set on a general "policy" basis because of the diversity of facts involved. (2) An informal rule-making proceeding was not the proper forum for considering transportation charges; any such determination must be made pursuant to an evidentiary hearing. (3) The rule is unnecessary because existing pipeline cost-of-service rates already reflect the costs involved·in transporting producers' liquids and liquefiable hydrocarbons. (4) Usually liquid movement is without significant cost to the pipeline, and thus a *de minimis* rule should apply unless there are exceptional circumstances. (5) The imposition of minimum rates for the transportation of liquids will inhibit natural gas exploration and discovery efforts. (6) Available alternatives to cost allocation should be considered by the Commission before making a final determination.

5. Minutes of Conference of 29 Sept. 1970, Docket No. R–338 (reprinted at Joint App. 34).

6. *Id.* (Joint App. at 36).

A second meeting was held on 15 October 1970. At this conference counsel for certain pipeline companies distributed nine sheets containing tabulations of cost of service figures which had been compiled for use in the Southern Louisiana Rate proceedings. It is clear from the minutes that this data was submitted solely for the purpose of attempting a settlement in the rule-making proceeding. It was in no sense evidence; the data's accuracy was not examined by other parties, no controverting data was introduced by anyone, and no witness who might have been cross-examined sponsored the figures.

The "minutes" also show that the FPC staff suggested settlement of the entire matter. It is unclear from the record what was meant by "settlement" or what form was contemplated. The minutes recite that "the suggestion was not favorably received," because a number of the parties "had not come prepared to consider the matter on a nation-wide basis" due to the short notice that had been given.[7] The ultimate decision to emerge from this meeting was that *"further conferences in this proceeding should be deferred pending"* the outcome of efforts to settle similar issues in the *Southern Louisiana* area rate proceedings.[8]

The settlement offer in *Southern Louisiana* did not meet with unanimous approval. However, the figures submitted in the context of this general settlement offer were eventually accepted by the Commission as being just and reasonable in a decision on the merits in that case.[9]

Without further conferences or notice in the rule-making proceeding challenged here, by Order No. 449 the Commission established generally applicable nationwide rates for the transportation of liquid and liquefiable hydrocarbons.[10] The Commission stated that these rates were being promulgated on the basis of the general rule-making proceeding that had been suspended pending the outcome of the *Southern Louisiana* settlement efforts. In issuing these rate schedules the Commission stated that it had concluded that the mere "allocation of costs" was not a feasible way of assuring that gas consumers would not be forced to pay a portion of the transportation costs of liquids and liquefiables; no reason was given for this conclusion.[11]

7. Minutes of Conference of 15 Oct. 1970, Docket No. R–338 (reprinted at Joint App. 47).

8. *Id.* (Joint App. at 48).

9. The Commission's actions in that proceeding have recently been affirmed by the Fifth Circuit in Placid Oil Co. v. FPC (SoLa II), 483 F.2d 880 (5th Cir. 1973).

10. Order Establishing Charges for Transporting Liquids and Liquefiable Hydrocarbons, FPC Order No. 449, 37 Fed. Reg. 2957 (31 Jan. 1972).
The Commission in its order referred to the content of the comments that had initially been submitted by the parties to the rule-making, to the events that had transpired at the two conferences that had been held, and to the contents of the nine sheets that had been handed out by some of the pipelines at the second conference. Reference was also made to the figures used in establishing the rates for liquids and liquefiables in the Southern Louisiana proceeding and to the contents of yet another pipeline rate proceeding. On the basis of this information the Commission stated that it had determined to prescribe minimum rates for the transportation of liquids and liquefiables for the entire nation. The rule *required* that pipeline companies charge at least two cents per Mcf per 100 miles for transporting liquefiables and twenty cents for transporting liquids. Pipeline companies would be free to charge more than this for transporting liquids and liquefiables, but they could not charge less.

11. This rule amended Part 2, General Policy and Interpretations, Subchapter A, Chapter I, Title 18 of the Code of Federal Regulations by adding a new section 2.71, which read as follows:
§ 2.71 Charges applicable to the transportation of liquids, liquefiable hydrocarbons, etc., for others.
When pipeline companies contract to purchase gas and agree to transport liquids and liquefiable hydrocarbons from field delivery points to processing plants for removal of such hydrocarbons, the transportation charge to be imposed for such service shall be the consideration set forth in the contracts

Thus what had begun as a Commission proposal to devise or define a policy of allocating costs had resulted in establishing rates. The original proposal, had it been adopted, would have said that pipelines could not charge the gas consumer a certain proportion of costs attributable to the transportation of products other than gas; the pipelines under this rule would not have been *obligated* actually to charge the product owner the proportion attributable to liquids and liquefiables. Mobil and others applied for rehearing, which was denied by the Commission. From this denial, Mobil brings this appeal.

█ Mobil raises a number of issues, two of which we believe are worthy of extended discussion.[12] First, Mobil argues that the Commission has no authority to set rates for the transmission of liquid hydrocarbons. It does not contest the FPC's jurisdiction to establish rates for liquefiables, but contends that the portion of the rate schedule dealing with liquids must be set aside as being

outside the powers conferred by the Natural Gas Act. Second, Mobil urges that all the rates for both liquids and liquefiables are invalid because the Commission erred in using "informal" rule-making procedures to fix specific minimum rates. It is argued that under the Natural Gas Act and the Administrative Procedure Act such rates can only be promulgated pursuant to formal, evidentiary hearings. Mobil raises as a separate issue the assertion that there is no "substantial evidence" on the record as a whole to support the Commission's findings of cost that were used in setting the rates under review. We believe the "substantial evidence" issue is closely related to the issue of what procedures are required in this case; the two issues will therefore be treated together in Part IV below.[13]

III. *Jurisdiction to Set Rates for the Transmission of Liquid Hydrocarbons*

The Commission's regulatory authority in this area comes solely from the

---

between the pipeline companies and those for whom the transportation service is rendered, unless the contractual consideration is less than .02 cents per Mcf per mile for liquefiable hydrocarbons and 20 cents per barrel for liquid hydrocarbons, in which case the aforesaid minimum charges shall apply. For sales certificated subject to the outcome of the rule making proceeding in Docket No. R–338, and for sales certificated after March 1, 1972, the transportation charge as of March 1, 1972, or as of the date of initial delivery, whichever is later, shall be as set forth in the respective contracts, unless the contractual consideration is less than the aforementioned minimum charges, in which case the minimum charges shall apply. The payment of the charges hereinbefore specified shall exempt any sales associated therewith from reductions in ceiling prices because of the rendering of the above-described transportation services by pipeline companies for sellers of gas.

12. Appellant's third main argument is that the rates set in this case are invalid because they are based upon evidence that under the Commission's own rules could not be considered. The Commission's rules *do provide that* "unaccepted proposals of settlement . . . shall be

privileged and shall not be admissible in evidence against any counsel or person claiming such privilege." 18 C.F.R., Ch. 1, Subch. A, pt. 1, § 1.18(e) (1970). The Commission, however, has interpreted this language to mean that such a privilege is not available to all parties to a proceeding, but may only be claimed by the person who made the offer. This court recently affirmed this interpretation of the rule, finding it neither arbitrary nor unreasonable. Mobil Oil Corp. v. FPC, 152 U.S.App.D.C. 119, 127 n. 8, 469 F.2d 130, 138 n. 8 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973). Since appellant did not make the settlement offer from which the data was taken it cannot protest the use of this information if its use was otherwise valid.

13. Mobil also argues that the rates are unduly discriminatory and unduly preferential. Because of inadequacies in the record, discussed in Part IV, *supra*, we are not able to evaluate this argument at this time. As with appellant's argument that there is not substantial evidence to support the Commission's findings, this issue is dependent on the adequacies of the administrative procedures used in setting the rates. We, therefore, do not discuss this as a separate issue at this time.

Natural Gas Act, which provides in relevant part that "[t]he provisions of this Act shall apply to the transportation of natural gas in interstate commerce . . . ."[14] The Act defines such natural gas as "either natural gas unmixed, or any mixture of natural and artificial gas . . . ."[15] This definition has been construed to mean a "mixture of gaseous hydrocarbons found in nature."[16]

The common thread running through all statements and interpretations of Commission jurisdiction is that its authority extends solely to "natural gas" and that "natural gas" is, as the name implies, gaseous and not liquid petroleum. There is no intimation in either the Natural Gas Act or decided cases that the Commission should be empowered to regulate the transportation of liquids.[17] In the past, this distinction between Commission jurisdiction over natural gas and absence of jurisdiction over liquids has been observed by both the Commission and the courts.

In the Commission's decision in Phillips Petroleum Co.,[18] the Commission concluded that the operation of a gasoline plant was nonjurisdictional and that the production of liquids was not a mere incident to the selling of gas. In the context of pipeline transportation, the distinction between the commodities was similarly recognized by this court's opinion in Mid-America Pipeline Co. v. FPC.[19] In that case a party claimed that a liquid extraction plant was subject to the Commission's jurisdiction because the facility was used as a conduit through which gas was transmitted. We rejected this argument and stated that the Commission was not required to exercise jurisdiction over the extraction operations.[20] Of particular relevance here, we noted that the interests of the gas consumer could be adequately protected by allocating costs between the operations over which the Commission had jurisdiction and those which it did not.[21]

---

14. Natural Gas Act, 15 U.S.C. § 717(b) (1970).

15. *Id.* at § 717a(5).

16. Deep South Oil Co. v. FPC, 247 F.2d 882, 888 (5th Cir. 1957). The sections of the Act prescribing Commission power to review and determine the rates at which natural gas is transported or sold grant only the power to set rates for "the transportation or sale of natural gas subject to the jurisdiction of the Commission." 15 U.S.C. §§ 717c(a) and 717d (a)(1970). The FPC's power to regulate has been interpreted to extend to "three things and three only": (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation and sale. Panhandle Eastern Pipe Line Co. v. Public Service Comm'n of Indiana, 332 U.S. 507, 516, 68 S.Ct. 190, 92 L.Ed. 128 (1947).

17 Indeed, the inference is to the contrary. *See* footnote 2, *supra.*

18. 24 F.P.C. 537 (1969). This case involved jurisdiction over plants for extraction and processing liquids and the relationship of those operations to the cost of service attributable to gas production.

The Commission stated the issue as being "whether the gasoline plant operations should be considered jurisdictional, in which case the gasoline plant costs and revenues would have to be reflected in the jurisdictional gas cost of service, or whether the gasoline plant operations should be considered non-jurisdictional, in which case some method is necessary for allocating costs between the liquids separated in the gasoline plants and the residue gas." *Id.* at 562.

19. 117 U.S.App.D.C. 352, 330 F.2d 226 (1964).

20. *Id.* at 355, 330 F.2d at 229.

21. In a similar vein the Commission has said

that neither the conversion of the Little Inch to the transportation of petroleum products nor its operation as a products carrier is subject to the jurisdiction of this Commission. In the matter of rates and certain other aspects, it would be regulated by the Interstate Commerce Commission.

Texas Eastern Transmission Corp., 17 F.P.C. 843, 851 (1957), remanded on other grounds sub nom., Chotin Towing Corp. v. FPC, 102 U.S.App.D.C. 69, 250 F.2d 394 (1957).

The several cases cited by the Commission do not support its assertion of jurisdiction over liquids.[22] In *Permian Basin Area Rate Cases*[23] the Supreme Court merely affirmed the Commission's assertion of jurisdiction over a *gaseous* stream of "casinghead gas" which included "entrained liquids" in a non-liquid form. Since this product was not a liquid at the time of production, *Permian* is neither decisive nor relevant here.

In FPC v. Louisiana Power & Light Co.[24] the Supreme Court simply upheld the Commission's jurisdiction over the pipeline company's transportation of *natural gas;* the Commission was not setting rates for that commodity. The Commission has always had the power to regulate natural gas being transported in interstate commerce; this case does not constitute an expansion of the FPC's jurisdiction and is of no help to the Commission here.

The pipeline rate cases[25] cited by the Commission in its brief, far from supporting its position, show that the creation of rates over liquids is not the proper way to protect the gas consumer's interests, rather that the method of allocation of costs is satisfactory. None of these cases endorse the establishment of mandatory minimum rates for services over which the Commission has no jurisdiction.

■ The Commission essentially argues that it has jurisdiction here because the transportation of liquids is part of a total transaction that includes the transportation of natural gas. As this court has noted, however, "Congress did not give the FPC *carte blanche* to take whatever action it might consider appropriate in furtherance of" the objectives of the Act.[26] The Commission cannot gain jurisdiction over an activity simply by characterizing it as part of a "total transaction" of which another part happens to be subject to the FPC's control. The Commission has jurisdiction over *sales of natural gas at the wellhead* for resale in interstate commerce.[27] Acceptance of the FPC's argument would inevitably lead to the conclusion that the Commission has and must exercise jurisdiction over *similar wellhead sales of oil* merely because oil and gas are ordinarily produced simultaneously from a single well. We expect the Commission would recoil from that logical extension.

22. In one paragraph of its 68-page opinion in Placid Oil Co. v. FPC (SoLa II), 483 F.2d 880, (5th Cir. 1973), the Fifth Circuit approved rates set by the FPC for the transportation of liquids. *Id.* at 911. This approval cannot, however, be taken as supporting the Commission's assertion of jurisdiction over liquids in the case at bar. The Fifth Circuit did not consider or even mention the jurisdictional issue which now confronts this court. In light of the otherwise exhaustive nature of the opinion, we can only conclude that the parties in the proceeding failed to argue the issue to the court.

This apparent oversight is understandable in light of the history of *SoLa II.* The rate structure approved by the Fifth Circuit began as a proposed settlement offer, *id.* at 892, which was ultimately adopted *in toto* by the Commission as a decision on the merits. *Id.* at 894. The rate for transportation of liquids was a small, arguably insignificant part of this rate structure. The parties in that case, which included Mobil Oil Corp., were undoubtedly less concerned than here with invalidating the rates for liquids and simply failed to notice or argue the jurisdictional issue.

23. 390 U.S. 747, 820 n. 111, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).

24. 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed. 2d 369 (1972).

25. *City of Detroit v. FPC,* 97 U.S.App. D.C. 260, 269–271, 230 F.2d 810, 819–821 (1955), cert. denied, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48 (1956); Cities Service Gas Co. v. FPC, 155 F.2d 694, 703 (10th Cir.), cert. denied, 329 U.S. 773, 67 S.Ct. 191, 91 L.Ed. 664 (1946); Hope Natural Gas Co. v. FPC, 134 F.2d 287, 307–308 (4th Cir.), rev'd on other grounds, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1943).

26. Mobil Oil Corp. v. FPC, 149 U.S.App. D.C. 310, 463 F.2d 256, cert. denied, 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1972).

27. Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

The separable nature of gas and liquid transportation is quite obvious. Even the rates set by the Commission indicate the differing character of the activities —transportation rates for gases and liquefiables are expressed in "Mcfs," while rates for liquids are expressed in "barrels." The commodities differ in form, substance, metering, accounting, and all other incidents of distinct, separable commodities.

We do not ignore the need to assure that users of gas are not asked to pay for the transportation of a commodity they are not using. We recognize that the Commission must have some mechanism to assure that injustice does not result. The proper method is not, however, to extend the Commission's jurisdiction beyond that granted by Congress.

We are not confronted with a case where the Commission has demonstrated that rate jurisdiction over liquids is necessary to preserve its rate jurisdiction over natural gas. Under the statute as written, in the last analysis such assertion would have to be presented to Congress, but we think it important to bring out that the necessity has simply not been demonstrated on this record. The Commission has never stated why it concludes that the well-established practice of allocation of costs between liquids and gas has suddenly become inadequate. The Commission indicates that some kind of national approach is necessary. But there could be a system of allocation that is national in its coverage and reach. Under a properly administered allocation system, the service attributable to other commodities would not be allocated to the cost of gas. Under this method the dichotomy contemplated by the Act would be preserved, just as it has been in the numerous prior cases under this statute in which similar questions have arisen.[28]

For the foregoing reasons, we set aside Order No. 449 insofar as it covers the transportation of liquids. It is clear, however, and appellant does not contest, that the Commission has the authority to set rates for the transportation of liquefiable hydrocarbons. We must, therefore, inquire further into the lawfulness of those rates as established in this proceeding.

## IV. Rates for the Transportation of Liquefiable Hydrocarbons

### A. Requirements of the Administrative Procedure Act

Petitioner argues that the administrative procedures followed by the Commission in setting the rates under review were so defective that they must be held invalid. The contention is that the Natural Gas and Administrative Procedure Acts require that the Commission engage in so-called "formal rule-making" as described in sections 556 and 557 of the APA.[29] Under these sections parties have the right to submit evidence and engage in some form of cross-examination; this is essentially rule-making using adjudicative procedures.

On the other hand, the FPC believes that it may proceed in an informal manner under section 553 of the APA.[30] These informal procedures require only that notice of the proposed rule be given in the Federal Register and that interested parties be permitted to "comment" on the rule.

The positions taken by the parties present the court with a mutually exclusive, either-or choice: if the Commission may use the informal procedures of section 553, then arguably the procedures used to set the rates under review were adequate; if the FPC may only make rates by using the formal procedures of sections 556 and 557, then the procedures used here were inadequate

28. *See, e. g.,* cases cited footnote 25, *supra.*

29. 5 U.S.C. §§ 556 and 557 (1970).

30. Administrative Procedure Act § 4, 5 U.S.C. § 553 (1970).

and the orders under attack must be set aside.

■ We decline to hold that the Commission is required by either statutory language or the Constitution to observe strictly the procedures outlined in sections 556 and 557 of the APA.[31] Although the Commission is not required to proceed with the rigor urged by petitioner, for other reasons we believe that the procedures employed here were inadequate and the rate orders under attack must be set aside.

The two extreme positions taken by the opponents in this case were founded upon a misconception of the separate and composite requirements of the Administrative Procedure Act, the Natural Gas Act, several opinions of this court and the Supreme Court's opinions in Morgan v. United States and United States v. Florida East Coast Railway Co.[32] Within the baroque structure created by these converging elements, there is admittedly some room for confusion. With a full realization that our efforts may not be altogether successful, we first turn to an elucidation of this complex and oftentimes puzzling area of the law.

### 1. *Formal Rule-Making Under the APA*

■ Petitioner argues that the formal procedures outlined in sections 556 and 557 of Title 5 U.S.C. should have been followed in setting the disputed rates. These formal procedures by their terms, however, are only required when the substantive statute (in this case the Natural Gas Act) requires that rules be made "on the record after opportunity for an agency hearing."[33] The Natural Gas Act does not provide on its face that rates will be made by an "on the record" proceeding. Taking the language of the APA and the Natural Gas Act together, but nothing else at this time, the strictures of sections 556 and 557 need not be followed here.

There is some danger in according too much weight to magic words such as "on the record." However, the Supreme Court's recent opinion in United States v. Florida East Coast Railway Co.[34] emphasized the importance of this phrase and virtually established it as a touchstone test of when section 556 and section 557 proceedings are required. The Interstate Commerce Commission statute under which the rates were promulgated in *Florida East Coast* required that there be a "hearing," but did not specify what sort of "hearing" should be held.[35] Most significantly, the ICC statute did not require that they be made "on the record."

The fact that a "hearing" was required was accorded no particular significance by the Court. This was interpreted as merely a statement of Congressional intent to require a hearing of some sort—either formal or informal—but was of no help in determining which kind. In addition, the Court found nothing in the legislative history that indicated that Congress intended the ICC to use formal procedures in this context.[36] Finally, the Court disposed of the argument that the Constitution required more exhaustive proceedings than had been accorded.[37]

---

31. Administrative Procedure Act §§ 7 and 8, 5 U.S.C. §§ 556 and 557 (1970).

32. 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) and 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

33. 5 U.S.C. § 553(c) (1970).

34. 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed. 2d 223 (1973).

35. Interstate Commerce Act § 1(14)(a), 49 U.S.C. § 1(14)(a) (1970).

36. 410 U.S. at 231, 93 S.Ct. at 814.

37. *Id.* at 244–245, 93 S.Ct. 810. Distinguishing between an agency's legislative and adjudicative functions, the Court determined that this was a situation in which the agency was creating a generally applicable rule rather than adjudicating factual disputes. The Court then concluded that under the relevant cases the Constitution had never required exhaustive judicial-style hearings, when a prospective quasi-legislative rule was promulgated in a situation not involving significant factual disputes.

Although the situation in *Florida East Coast* is distinguishable in several critical aspects from the instant case,[38] we believe it is controlling on the narrow point of whether the Commission must rigorously comply with the standards of sections 556 and 557 of the APA. The Natural Gas Act does not on its face require that rates be made "on the record" and we can find nothing in the Act's legislative history indicating that Congress felt that "on the record" rule-making, with all its procedural formalities, was required in this case.

### 2. *Informal Rule-Making*

We conclude that the FPC need not employ the precise procedures set forth in sections 556 and 557 of the APA. It does not follow, however, that the Commission may proceed with only the guidance of the less rigorous standards of section 553.[39] The Commission's position assumes that there are only two permissible forms of procedures cognizable under the APA, that the two are mutually exclusive, and that their existence precludes the use of any other procedures that lie between them.[40] This rigid interpretation of what is permitted and required under the APA is inaccurate, as it would not meet the multifarious situations arising before the numerous agencies charged with the administration of various and varied statutes.

Flexibility in fitting administrative procedures to particular functions is critically important in evaluating the APA and has been a dominant theme in a number of opinions by this court. No court, to our knowledge, has ever treated the explicit language of section 553 on the one hand and sections 556 and 557 on the other as expressing every type of procedure that might be called for in a particular situation.

---

**38.** Text accompanying footnotes 80–83, *ante*.

**39.** From the record it appears probable that the FPC did not even comply with the minimal requirements of section 553. Section 553 requires in part that notice shall be given of the "terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3) (1970). In this case the parties were informed that the proceedings would be to consider the advisability of establishing a general policy of allocating costs to liquids and liquefiables. *See* footnote 3, *supra*, and accompanying text. The resulting rule established specific rates for these commodities. *See* footnote 10, *supra*, and accompanying text. Although there is certainly no requirement that the resulting rule *conform precisely to that which* is proposed, there is a serious question whether sufficient notice was given in this case.

**40.** This argument in syllogistic form is as follows. Congress established two types of rule-making procedures in the APA—informal under section 553 and formal under sections 556 and 557. Sections 556 and 557 proceedings are only required when the regulatory statute calls for "rulemaking on the record." Since on the record proceedings are not called for in this situation, section 556 and 557 proceedings are unnecessary. Therefore, the informal procedures outlined in section 553 must be adequate.

The APA itself makes no such rigid demarcation between "formal" and "informal" rule-making as both parties here seem to argue. In *Florida East Coast* Justice Rehnquist pointed out:

> [I]t cannot be doubted that a statute that requires a "hearing" prior to rule-making may in some circumstances be satisfied by procedures which meet only the standards of § 553. The Court's opinion in FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), supports such a broad definition of the term "hearing."
> Similarly, even where the statute requires that the rulemaking procedure take place "on the record after opportunity for an agency hearing," thus triggering the applicability of § 556, subsection *d* provides that the agency may proceed by the submission of all or part of the evidence in written form if a party will not be "prejudiced thereby." Again the Act makes it plain that a specific statutory mandate that the proceedings take place on the record after hearing may be satisfied in some circumstances by evidentiary submission in written form only.

At 241, 93 S.Ct. at 819.

The entire thrust of our opinion in City of Chicago v. FPC [41] was that artificial distinctions based upon the language of the APA should be avoided in determining what procedure should be followed. There we had before us a dispute regarding the type of procedures called for, in effect the reverse of the situation here:

> Petitioner claims that the proceeding was intended by the Commission, and understood by the parties, to be an "adjudicatory" one but that the Commission impermissibly changed it to a rule-making proceeding at the last minute. . . .

> In many cases, it is unnecessary, and even unwise, to classify a given proceeding as either adjudicatory or rule-making. The line between the two is frequently a thin one and resolution of a given problem will rarely turn wholly on whether the proceeding is placed in one category or the other. Moreover, obsession with attempts to place agency action in the proper category may often obscure the real issue which divides the parties and requires our resolution.[42]

■ Our *City of Chicago* opinion also emphasized that strict adherence to the explicit dictates of the APA was not the primary test of the appropriateness of a particular type of procedure. Rather, the "primary objective is the acquisition of information which will enable the Commission to carry out effectively the provisions of the Natural Gas Act."[43] To this end the Commission should "realistically tailor the proceedings to fit the issues before it, the formation it needs to illuminate those issues and the manner of presentation . . . ."[44]

Support for this flexible interpretation of the APA may be observed in other areas of administrative law. In American Airlines v. CAB,[45] this court sitting *en banc* articulated this approach in approving procedures that were more rigorous than those of section 553 and less rigorous than those of sections 556 and 557:

> This court has indicated its readiness to lay down procedural requirements deemed inherent in the very concept of fair hearing for certain classes of cases, even though no such requirements had been specified by Congress. Gonzalez v. Freeman, 118 U.S.App.D. C. 180, 334 F.2d 570 (1964); Pollack v. Simonson, 121 U.S.App.D.C. 362, 350 F.2d 740 (1965).[46]

In considering the appropriateness of procedures we bear in mind this court's observation in *American Airlines* that "[i]t is part of the genius of the administrative process that its flexibility permits adoption of approaches subject to expeditious adjustment in the light of experience."[47]

We quite recently had occasion to apply these general principles in International Harvester Co. v. Ruckelshaus,[48] in which we considered what procedures were required in promulgating emissions control standards for automobiles. We did not resolve the issue by forcing the problem into the artificial cubbyholes of "informal" versus "formal." Rather, we examined what Congress intended to be accomplished when it called for "hearings" on pollution controls. We emphasized the procedures in fair contemplation required of the agency, in order to permit the reviewing court to conduct the kind of judicial review contemplated by Congress. The court concluded that emissions standards involved a determination of general policy of the sort amenable to legislative type hearings. We held these general policy questions

---

41. 147 U.S.App.D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

42. *Id.* at 739.

43. *Id.* at 744.

44. *Ibid.*

45. 123 U.S.App.D.C. 310, 359 F.2d 624 (1966) (en banc).

46. *Id.* at 318, 359 F.2d at 632.

47. *Id.* at 319, 359 F.2d at 633.

48. 155 U.S.App.D.C. 411, at 426, 478 F.2d 615, at 630 (1973).

to be inextricably bound up with relatively specific factual issues of the sort that ordinarily require testing by cross-examination and other adjudicatory procedures.

The court rejected, however, the argument that there was a general right to cross-examine witnesses to the same extent that might be permissible if the action were before a court of law. We reasoned that such a broad right would make the proceedings unduly cumbersome and, far from advancing the public interest, might actually inhibit the attainment of the ultimate goal to which the statute was directed.[49] We concluded that permitting the submission of pre-screened written questions would achieve the dual goals of adequately illuminating factual disputes while not unduly burdening the process with adjudicative procedures inappropriate for the specific job required under the statute. We did indicate that a limited right of cross-examination was to be provided with respect to certain types of issues that required cross-examination for fair ventilation.

The approach employed in *International Harvester* and other cases is entirely consistent with the language of the APA. The statute has long been interpreted as permitting an agency to provide more than the bare minimum described in section 553.[50] By like token, the formal proceedings of sections 556 and 557 do not require that full ad-

judicative methods be employed in every situation that may fall within its ambit. Thus, subsection (d) of section 556 provides that "in rule making . . . an agency may, when a party will not be prejudiced thereby, adopt procedures for the submission of all or part of the evidence in written form."[51] Even a superficial reading of the APA's legislative history shows that far from wanting to force agency procedures into narrowly defined categories, Congress was primarily concerned with fitting procedures to agency functions.[52]

The APA may be viewed as providing the outer boundaries of administrative procedures. Congress has determined that the procedures outlined in section 553 will be the minimum protections upon which administrative action may be based, according to interested parties a simple notice and right to comment. At the opposite end of the spectrum lie the requirements of sections 556 and 557. Those may be viewed as representing the highest degree of administrative protection that Congress believed would be necessary to protect interested parties. There is no reason, however, to conclude that Congress in establishing these limits intended to preclude all the possible formulations that might lie in between the two extremes. To so hold would run directly counter to several opinions of this court that have approved or required procedures that contained elements of both section 553 and

---

49. *Id.* at 631. Cf. Judge McGowan's statement in Automotive Parts & Accessories Association v. Boyd, 132 U.S.App.D.C. 200, at 207, 407 F.2d 330, at 337 (1968), that what is required is not "specific and detailed findings and conclusions of the kind customarily associated with formal proceedings," but a "concise general statement of . . . basis and purpose" which will enable a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." In Public Service Commission of New York v. FPC, 151 U.S.App.D.C. 307, 467 F.2d 361 (1972), we found this test appropriate for the objectives of FPC action there; we do not so find here.

50. City of Chicago v. FPC, 147 U.S.App. D.C. 312, 324, 458 F.2d 731, 743 (1971), cert. denied, 41 U.S.L.W. 3635 (S.Ct., 5 June 1973). Cf. Justice Rehnquist in *Florida East Coast*, 410 U.S. at 236 n. 6, 93 S.Ct. at 817 n. 6: "Moreover, since any agency is free under the Act to accord litigants appearing before it more procedural rights than the Act requires, the fact that an agency may choose to proceed under §§ 556 and 557 does not carry the necessary implication that the agency felt it was required to do so."

51. 5 U.S.C. § 556(d) (1970).

52. S.Rep. No. 752, 79th Cong., 1st Sess. 4–5 (1945) (reprinted in Administrative Procedure Act—Legislative History, 79th Congress, 1944–46, at pp. 191–192).

section 556 and 557 proceedings, but fully conform to neither.[53]

To permit flexibility under the APA does not, however, mean that agencies are granted *carte blanche* to proceed in any way they may see fit. Flexibility is not synonymous with uncontrolled discretion. Furthermore, the FPC may have interpreted this court's prior comments on the subject as permitting whatever the agency thought proper so long as it did not fall beneath the minimum of section 553. This unfortunate reading may have been the basis for the Commission's belief that the superficial hearings, "conferences," accorded in this case were adequate.

Such a reading of the Act and our opinions is simply incorrect. It is true that the nature of a particular regulatory scheme may permit or even require less than the formal procedures of sections 556 and 557. It is equally true, however, that an examination of the purposes and provisions of the substantive statute being administered may require that more than the comparatively feeble protections of section 553 of the APA may be called for. A final determination of what procedures are appropriate here must turn upon an analysis of the regulatory scheme envisioned by Congress in passing the Natural Gas Act and a determination of what is necessary to effectuate the policies of this regulatory statute.

### B. *Procedures Required Under the Natural Gas Act*

#### 1. *Section 16 and Administrative Flexibility*

In promulgating the rates under review the Commission stated that it was acting pursuant to sections four, five and sixteen of the Natural Gas Act. Sections four and five are the sections which grant authority to set "just and reasonable" rates.[54] Section sixteen allows the Commission to perform "any and all acts"—including making orders and rules—that are "necessary or appropriate to carry out the provisions of [the Natural Gas Act]."[55] The Commission argues that section sixteen permits it great latitude in the procedures it will follow in setting rates under sections four and five.

 In essence, the Commission reads section sixteen as performing the same function with regard to the Natural Gas Act that the "necessary and proper" clause performs in the United States Constitution. Accordingly, if something is required by another provision of the Natural Gas Act, section sixteen permits that which is "necessary or appropriate" to get the job done. The Commission has determined the procedures "necessary and appropriate" here to be the minimal requirements of section 553 of Title 5 U.S.C.—*i.e.*, public notice and an opportunity to comment.

---

53. *See* footnotes 41-49, *supra*.

54. *See* footnote 1, *supra*.

55. The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this act. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this act; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified there-

in, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.
Natural Gas Act § 16, 15 U.S.C. § 717o (1970).

These simple procedures are "necessary and appropriate" in part because the Commission feels it would be unduly burdensome to permit more elaborate inquiry into the matter.

The Commission's approach goes too far. A more tempered and balanced approach would accord reasonable significance to section 16, without making it a *carte blanche*. "Such 'necessary or appropriate' provisions do not have the same majesty and breadth in statutes as in a constitution, . . . [but] they are not restricted to procedural minutiae, and they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act."[56]

Support for the Commission's expansive reading of the meaning of section sixteen is allegedly found in the *Permian Basin Area Rate Cases*.[57] There the Supreme Court approved procedures by which uniformly applicable rates were set for all the gas producers in a particular area. This form of rate-making was not mentioned in either the Natural Gas Act or the Administrative Procedure Act; it is doubtful that the framers of either piece of legislation ever conceived of such a procedure.

In the course of its decision the Court recognized that a case-by-case method of rate-making had seriously overburdened the Federal Power Commission, and that the entire regulatory process was in danger of collapsing because of its inability to perform its statutory duty to set just and reasonable rates for gas production. In the face of this overwhelming task the Court agreed that strict adherence to traditional forms of rule-making must give way to the exigencies of the situation. Recognizing that it was an experiment and might not be the final answer to the problem, the Court approved the area-wide method of setting rates. The entire tone of the opinion evinces a tolerance for flexibility and experimentation in administrative process.

In the course of its discussion the Court referred to section sixteen as supporting the position that the Commission should be permitted substantial discretion in formulating procedures for the administration of the Act.[58] In a similar vein this court, in two recent opinions, has taken section sixteen as supporting the validity of administrative procedures that departed from established methods and that permitted substantially less elaborate safeguards than had previously been the case.[59] The FPC relies on this language as authority to deal with its problems, apparently in whatever manner it deems necessary or expeditious, so long as a slight bow in the direction of section 553 of the APA is made. This far-reaching interpretation of section sixteen seriously misconstrues both the nature of the provision and the import of court references to it.

First, it is significant that the Supreme Court, in the *Permian Basin Area Rate Cases*, did not hold the procedures under examination there to be valid *because of* any authority granted under section sixteen. Rather, the Court sought and found a justification for experimentation and flexibility in the *nature* of the regulatory scheme envisioned by Congress. The Court first isolated the purpose behind the passage of the Natural Gas Act. It then noted that it has long been the rule that "administrative authority must be measured in part by the purposes for which it was con-

---

56. Niagara Mohawk Power Corp. v. FPC, 126 U.S.App.D.C. 376, 381, 379 F.2d 153, 158 (1967).

57. 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed. Ed.2d 312 (1968).

58. *Id.* at 776 n. 40, 88 S.Ct. 1344.

59. Mobil Oil Corp. v. FPC, 152 U.S.App. D.C. 119, 127, 469 F.2d 130, 138 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973); City of Chicago v. FPC, 147 U.S.App.D.C. 312, 324, 458 F.2d 731, 743 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

ferred . . ." and that statutory provisions must therefore be liberally construed.[60] The Court then concluded its analysis as follows:

> The Commission has asserted, and the history of producer regulation has confirmed, that the ultimate achievement of the Commission's regulatory purposes may easily depend upon the contrivance of more expeditious administrative methods. The Commission believes that the elements of such methods may be found in area proceedings. "[C]onsiderations of feasibility and practicality are certainly germane" to the issues before us. Bowles v. Willingham, *supra,* 321 U.S. 503, at 517, 64 S.Ct. 641, 88 L.Ed. 892. We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.[61]

At no point in its discussion did the Court rely upon section sixteen as a basis for its conclusion that area rate-making was permissible. It merely referred to section sixteen as giving "additional assistance" to a conclusion reached on the basis of its analysis of overall Congressional statutory intent and the nature of the regulatory process involved.[62] *Permian* does not construe section sixteen as a grant of additional authority. At most, the Court reads the provision as being designed to assure that the Commission will be able to perform the functions granted under the substantive portions of the Act.

In a recent decision of this court Judge Tamm likewise interpreted section sixteen in this limited fashion:

> The Commission asserts for the first time on appeal that it relies upon Section 16 of the Natural Gas Act and Section 309 of the Federal Power Act as authority for Order 427. Although we view this as *"post hoc* patchwork," we have considered and rejected the argument. Both sections are of an implementary rather than substantive character. The cases have made abundantly clear that while these provisions must be read in a broad expansive manner, they can only be implemented "consistently with the provisions and purposes of the legislation," and "that they authorize an agency to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act." *These sections merely augment existing powers conferred upon the agency by Congress, they do not confer independent authority to act.*[63]

The opinions of this court in City of Chicago v. FPC[64] and more recently in Mobil Oil Corp. v. FPC[65] are not to the contrary. *City of Chicago* clearly did not rely upon section sixteen as a *source* of authority for the procedures involved there. Indeed, much of the discussion of section sixteen is in the context of a discussion of the need to test procedures by the nature of the regulatory function commanded by Congress. The language

---

60. 390 U.S. at 776, 88 S.Ct. at 1364.

61. *Id.* at 777, 88 S.Ct. at 1365.

62. *Id.* at 776 n. 40, 88 S.Ct. 1344. Perhaps the final point to be made about *Permian* is the simple one that it was an approval of area ratemaking, and not a contraction of procedures. *Permian's* record was compiled on the basis of essentially adjudicatory procedures. All that the Court was doing was taking into account the adjustments that were appropriate in adjudicatory procedures when the proceeding's subject matter was broadened from the issue of rates

for an individual company to the context of rates for all producers in an area.

63. New England Power Co. v. FPC, 151 U.S.App.D.C. 371, 376, 467 F.2d 425, 430 (1972), cert. granted, 411 U.S. 981, 93 S.Ct. 2269, 36 L.Ed.2d 957 (1973) (emphasis added).

64. 147 U.S.App.D.C. 312, 458 F.2d 731 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

65. 152 U.S.App.D.C. 119, 469 F.2d 130 (1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 159 (1973).

in *Mobil* is even less relevant since rate-making was not involved. There the Commission had established a *temporary* rule designed to maintain the status quo pending the outcome in conventional area rate proceedings being conducted pursuant to sections four and five of the Act. Thus the Commission was using section sixteen to preserve its rate-making authority by establishing a moratorium; it was not using the vague language of that section to make rates. Such an implementing rule, *i.e.*, a writ in aid of jurisdiction to be exercised under another section of the statute, is precisely what section sixteen was designed to permit. The court did not intimate that the rudimentary procedures approved there would be adequate in setting rates—indeed, the inference is to the contrary.[66]

We conclude that section sixteen standing alone does not permit the sketchy procedures employed in originally setting the rates currently under review. The substantive provisions of the Act contemplate certain procedures, as incident to the functions provided. The range of permissible procedures must be derived from these sections, sections like sections 4 and 5 of the Natural Gas Act, and the functions they describe. Section 16, which uses a broad generality of "necessary or appropriate" that is not rooted in a function, cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined.

### 2. *Sections Four and Five of the Natural Gas Act*

■ Any administrative proceeding designed to set rates for a large number of separate enterprises possesses elements of both a legislative policy determination and an adjudicative resolution of disputed facts.[67] Although these distinct elements are intertwined and necessarily exist simultaneously in any rate-making, one may predominate over the other. Rate-making always involves factual predicates; yet the facts relevant to rates in any given industry may be more or less well established. For example, if industry costs are well established, the rate-making process would consist primarily of policy judgments such as the fair rate of return or the desired level of safety; appropriate procedures for resolution of these policy disputes would not resemble adjudication. In contrast, if the rate of return policy was clear but the cost base uncertain, adjudication might be more appropriate. Congress could take into account the differences in these two type situations and require greater evidentiary support for factual findings in some instances than in others.

The degree of fact dispute resolution necessary in a particular proceeding is directly related to the degree of evidentiary support required by Congress in establishing a factual basis for a proposed rate. If a relatively high degree of evidentiary support is required in establishing a factual predicate, the rule-making procedures must be designed to create this. Thus, if we know the degree of evidentiary support required, this will indicate the type of procedures that Congress intended to be employed.

■ The Natural Gas Act explicitly states that factual determinations must be supported by "substantial evidence."[68]

---

66. The court discussed the rate ceilings with the understanding that they were intended to be in effect only until permanent rates were set by traditional methods. 152 U.S.App.D.C. at 129, 469 F.2d at 140. *Cf.* 28 U.S.C. § 1651.

67. This court has specifically rejected the idea that an agency may avoid finding facts and having those findings reviewed by the courts by the simple expedient of characterizing a proceeding as "rule-making." City of Chicago v. FPC, 147 U.S.App.D.C. 312, 324–325, 458 F.2d 731, 743–744 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).

68. The Natural Gas Act provides that "The finding of the Commission as to

Unlike many other forms of rule-making, rate-making necessarily rests upon findings of facts.[69] The phrase "substantial evidence" is a term of art well recognized in administrative law. This requirement imposes a considerable burden on the agency and limits its discretion in arriving at a factual predicate.[70] Substantial evidence as interpreted by the Supreme Court "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[71] The Court in a later opinion explained further that "it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."[72] It has also been established that in determining whether facts are supported by substantial evidence the entire record must be considered and not merely the evidence tending to support the finding.[73]

From this outline of the meaning of "substantial evidence," we can perceive the sort of procedures required. Clearly some evidence supporting the FPC's finding must be in the record. *More importantly for our purposes, the rule that the "whole record" be considered— both evidence for and against—means that the procedures must provide some mechanism for interested parties to introduce adverse evidence and criticize evidence introduced by others.* This process of introduction and criticism helps assure that the factual basis of the FPC rates will be accurate and provides the reviewing court with a record from

---

the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b) (1970). The necessary implication is that if the findings are not supported by "substantial evidence" they will not be permitted to stand.
It is highly significant that this substantial evidence test is a part of the actual language of the Natural Gas Act. This indicates that Congress was particularly concerned with the degree of certainty required in establishing factual predicates in rate-making.

69. As illustrated, rate-making by whatever method necessarily involves finding facts. There can be no dispute that Congress in passing the Natural Gas Act expected that rates would be tested by this substantial evidence standard. This court has specifically so held. City of Chicago v. FPC, 147 U.S.App.D.C. 312, 325, 458 F.2d 731, 744 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). Every other case in which the factual basis of an FPC rate has been challenged has assumed that the substantial evidence test is the proper method of evaluating the factual predicate. *See, e. g.,* Permian Basin Area Rate Cases, 390 U.S. 747, 816, 824, 827, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Placid Oil Co. v. FPC (SoLa II), 483 F.2d 880, at 885 (5th Cir. 1973).

70. An indication of the nature of the procedural requirements imposed by the "substantial evidence" test may be gained from examining the use of that phrase in the Administrative Procedure Act. It provides that:

　.　.　.　The reviewing court shall—

　.　　.　　.　　.　　.

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

　.　　.　　.　　.

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewable on the record of an agency hearing provided by statute.
5 U.S.C. § 706(2) (E) (1970).
This language indicates that Congress expected that the substantial evidence test would be used in conjunction with formal procedures under sections 556 and 557. Thus Congress, in using the phrase "substantial evidence" in another statute, undoubtedly thought that similar procedures would be used in creating this evidentiary record. This supports the conclusion that the requirement of facts based on substantial evidence mandates greater procedural protection than those accorded under section 553 of the APA.

71. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

72. NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S. Ct. 501, 83 L.Ed. 660 (1939).

73. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

which it can determine if the agency has properly exercised its discretion.

Our interpretation of the significance of the "substantial evidence" requirement is supported by the *Attorney General's Manual on the Administrative Procedure Act*.[74] This Manual was prepared more or less contemporaneously with the adoption of the Act and has been described by this court as being an "authoritative source" of information concerning the APA.[75] Indeed, the Manual went even further than this court and interpreted the "substantial evidence" requirement as meaning formal hearings under sections 556 and 557:

> Sometimes the requirement of decision on the record is readily inferred from other statutory provisions defining judicial review. For example, rate orders issued by the Federal Power Commission pursuant to the Natural Gas Act (15 U.S.C. 717) may be made only after hearing; upon review in a circuit court of appeals or the Court of Appeals for the District of Columbia, the Commission certifies and files with the court "a *transcript of the record* upon which the order complained of was entered," and the Commission's findings of fact *"if supported by substantial evidence,* shall be conclusive." It seems clear that these provisions of the Natural Gas Act must be construed as requiring the Commission to determine rates "on the record after opportunity for an agency hearing." See H.R.Rep. p. 51, fn. 9 (Sen.Doc. p. 285).[76]

We have, of course, concluded that full section 556 and 557 proceedings are not required in the case at bar. The Attorney General's conclusion is, however, understandable. Clearly the existence of the "substantial evidence" requirement

in the Natural Gas Act demands that facts be determined and reviewed with a greater degree of certainty than is possible under the "informal" methods of section 553 of the APA. The Attorney General simply concluded that section 553 was inadequate; the only obvious, easily referenced alternative in the APA was full adjudicative proceedings under sections 556 and 557, hence the stiffer test was stated as providing the appropriate standard to which to repair, a conclusion with which we do not agree as applied to this case. The fundamental principle behind the statement in the Manual is what we find important here: in any administrative proceeding, the type of procedure required is related and proportionate to the degree of evidentiary support required for the agency's decision.

Our conclusion that the "substantial evidence" requirement necessitates some sort of adversary, adjudicative-type procedures is made more obviously necessary by considering the record in this case, such as it is. The FPC admittedly made findings of fact here regarding transportation costs and points to evidence which it claims supports the accuracy of these facts.[77] It is clear, however, that none of the interested parties knew that this evidence—which was taken from a number of different sources —was to be the basis for the Commission's action. Consequently, no one was able to introduce evidence in opposition, criticize the Commission's position, or point out flaws by questioning the validity of its sources. As the record stands, in reviewing the Commission's action we are unable to decide whether its factual determinations are supported by substantial evidence. Much of the evidence appears possibly suspect, we have no way of knowing from the record whether the figures are valid.[78] There is no

---

74. United States Department of Justice (1947).

75. Siegel v. Atomic Energy Commission, 130 U.S.App.D.C. 307, 314, 400 F.2d 778, 785 (1968).

76. *See* footnote 74, *supra*, at 33.

77. Brief for Federal Power Commission at 40.

78. In establishing the rates under review the Commission used data relevant to only ten pipelines out of 116, without any showing that these were typical or repre-

evidence in the record except that which the Commission has chosen to include to support its position.[79] "Substantial evidence," the test of the Natural Gas Act, requires the consideration of the "whole record," and the whole record should contain sufficient unimpeachable—or at least persuasive—evidence to support the conclusion the Commission has reached if its action is to be sustained on appeal.

Informal comments simply cannot create a record that satisfies the substantial evidence test. Even if controverting *information* is submitted in the form of comments by adverse parties, the procedure employed cannot be relied upon as adequate. A "whole record," as that phrase is used in this context, does not consist merely of the raw data introduced by the parties. It includes the process of testing and illumination ordinarily associated with adversary, adjudicative procedures. Without this critical element, informal comments, even by adverse parties, are two halves that do not make a whole. Thus, it is adversary procedural devices which permit testing and elucidation that raise information from the level of mere inconsistent data to evidence "substantial" enough to support rates.

The Supreme Court's recent decision in United States v. Florida East Coast Railway[80] in no way diminishes the validity of our conclusion that the "substantial evidence" test requires more exhaustive procedures than those in section 553 of the APA. As we have previously noted, in that case the Supreme Court upheld rates set by the ICC under informal section 553 procedures, but the ICC statute does not require that factual determinations be supported by substantial evidence. While stating that the rates were based upon "factual inferences," the Court concluded that the statute did not mandate inquiry into the substantiality of the evidentiary basis, since the factual inferences were not used "in adjudicating a particular set of disputed facts."[81]

The ICC statute provides that "the Commission shall give *consideration* to" various aspects of the railroad industry.[82] The test then would be whether the Commission "considered" everything it was supposed to in making its determination. If the reviewing court determines that the ICC has "considered" everything that it should, it will inquire no further.[83] This "consideration" test

---

sentative. It also appears from the record that this data was not matched as to test year, and yet the Commission gives equal weight to all the figures used without taking into account variances that might occur between years.

Mobil also contends that certain of the costs used by the Commission in formulating the rates had later been found to contain excessive amounts of depreciation expenses and that certain figures employed by the Commission have since been found to be overstatements of costs. Brief for Mobil Oil Co. at 30–31. Due to deficiencies in the record, however, we are unable to evaluate fully these contentions. This points up the basic inadequacy of the record before us and the procedures used in compiling it.

79. Our inability here is in marked contrast to the situation in the recent area rate decision rendered in Placid Oil Co. v. FPC, 483 F.2d 880 (5th Cir. 1973). In that situation the court was given a full

record with which to judge the agency's action. In another recent case the Fifth Circuit explicitly refused to speak to the issue of whether informal rule-making procedures could be used to set rates. *See* Other Southwest Area Rate Case v. F.P.C. (OSWA I), 484 F.2d 469, at 480 n. 23 (5th Cir. 1973).

80. 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed. 223 (1973).

81. 410 U.S. at 246, 93 S.Ct. at 821.

82. 410 U.S. at 235, 93 S.Ct. at 816.

83. It is clear that under the ICC statute the Supreme Court was not obligated to apply the substantial evidence test to the rates under consideration. Unlike the Natural Gas Act, the ICC statute does not contain a requirement that factual determinations be tested by substantial evidence; the APA only requires facts to be tested by substantial evidence if the proceedings are required to be conducted under sections 556 and 557 of the APA.

obviously permits the ICC much greater leeway and requires much less certainty than does the "substantial evidence" test. It is entirely appropriate that the procedures for "consideration" of evidence would employ almost none of the dispute resolution procedures ordinarily associated with adjudication. Under these circumstances prevailing in *Florida East Coast,* the informal procedures could be more than adequate.[84]

In both *Florida East Coast* and Morgan v. United States [85] the critical factor as to proper procedure was derived from the substantive statute itself. In *Morgan* Chief Justice Hughes referred to "the 'full hearing' required by the statute" and then said, "Nor is it necessary to go beyond the terms of the statute in order to consider the constitutional requirement of due process as to notice and hearing. For the statute itself demands a full hearing and the order is void if such a hearing was denied." [86]

Likewise, in *Morgan* the required procedure was derived from the nature of the responsibilities with which the agency was charged. Chief Justice Hughes inquired, "What is the essential quality of the proceeding under review, and what is the nature of the hearing which the statute prescribes," and then answered:

> It is a proceeding looking to legislative action in the fixing of rates of market agencies. And, while the order is *legislative* and gives to the proceeding its distinctive character [citation omitted], it is a proceeding which by virtue of the authority conferred has special attributes. . . .
>
> A proceeding of this sort requiring the taking and weighing of evidence, determinations of fact based upon the consideration of the evidence, and the making of an order supported by such findings, has a quality resembling that of a judicial proceeding. Hence

---

*See* footnote 70, *supra.* Since the Supreme Court concluded that sections 556 and 557 did not apply, the APA requirement was not applicable. Thus, neither the ICC statute nor the APA required that the substantial evidence test be used. In the case at bar the decisive distinguishing factor is that the Natural Gas Act instead of either the Interstate Commerce Act or the APA provides the procedural standard.

84. At no point in its 22-page opinion did the Court even mention the substantial evidence test. It is clear from the following language that the Court evaluated the procedures on the basis of whether the ICC had fully "considered" all the factors required under the statute:

The parties had fair notice of exactly what the Commission proposed to do, and were given an opportunity to comment, to object, or to make some other form of written submission. The final order of the Commission indicates that it gave *consideration* to the statements of the two appellees here. Given the "open-ended" nature of the proceedings, and the Commission's announced willingness to *consider* proposals for modification after operating experience had been acquired, we think the hearing

requirement of § 1(14)(a) of the Act was met.

*Id.,* at 241, 93 S.Ct., at 819 (emphasis added).

It is not surprising that Congress might be satisfied with a lesser degree of certainty in ICC factual determinations than in those of the FPC. The ICC has traditionally been permitted to base its determinations on relatively imprecise dispute resolution procedures. New England Division Cases, 261 U.S. 184, 196–197, 43 S.Ct. 270, 67 L.Ed. 605 (1923). It may well be that cost factors are sufficiently uniform in the areas of the economy under the ICC's jurisdiction so that procedures designed to produce precise factual dispute resolutions would be a waste of time. Whatever the Congress' intention with regard to the ICC, however, it has clearly chosen to require more of the FPC.

85. 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). The case was again before the Supreme Court in Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L. Ed. 1129 (1938). In *Florida East Coast* the Supreme Court distinguished *Morgan* for reasons not applicable here.

86. 298 U.S. at 477, 56 S.Ct. at 910.

it is frequently described as a proceeding of a *quasi-judicial* character. The requirement of a "full hearing" has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts.[87]

So here in the case at bar. The Natural Gas Act term "substantial evidence" smacks of a judicial proceeding, but as we have made clear, we pin nothing on categorization by "rule-making" or "adjudication," nor by "formal" or "informal," and neither did the Supreme Court in *Morgan* when it used *both* terms "legislative" and "quasi-judicial." What is important and decisive is the essential quality of the proceeding under review.

We recognize that the Tenth Circuit in its recent opinion in Phillips Petroleum Co. v. FPC [88] has specifically approved the use of section 553 procedures in establishing rates. With all due respect, we disagree with the two majority judges in *Phillips* in their construction of the breadth of discretion granted the Commission to formulate rules.[89] We

agree with dissenting Judge Seth, who based his position in part on the failure of the procedures used by the Commission to create a record that would adequately support the factual findings and permit judicial review,[90] a factor which plays a large part in our decision here.

The defect we find in the Commission's procedures here, and the resulting inadequacy of the evidence, could be remedied by according the procedure described under sections 556 and 557 of the APA, but such complete adjudicatory procedures are not required.

What is required are procedures which will adequately test the Commission's factual determinations and create a record that will allow a reviewing court to examine the agency's actions. The procedures required are related and proportionate to the test of evidentiary support which the agency's decision must ultimately withstand.

Compliance with this standard could conceivably be achieved in a number of ways.[91] There must, however, be some

---

87. 298 U.S. at 480, 56 S.Ct. at 911.

88. Phillips Petroleum Co. v. FPC, 475 F. 2d 842 (10th Cir. 1973).

89. The Tenth Circuit's conclusion was based upon its reading of sections 15 and 16 of the Natural Gas Act, the Supreme Court's opinion in Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), and this court's opinion in City of Chicago v. FPC, 147 U.S.App.D.C. 312, 324–325, 458 F.2d 731, 743–744 (1971). We have considered all of these statutory and judicial authorities in this opinion and have concluded that the discretion granted the Commission to formulate rules is not as broad as the Tenth Circuit has interpreted it to be. Contrary to the interpretation placed by the Tenth Circuit majority on *City of Chicago*, we did not there rely on section 16 as a source of authority for the FPC procedures there involved. And as our later decision in New England Power v. FPC, 151 U.S.App.D.C. 371, at 377, 467 F.2d 425, at 431, No. 71–1539 (1972),

states: "These sections [16] merely augment existing powers conferred upon the agency by Congress, they do not confer individual authority to act." Similarly, we find nothing in the Supreme Court's opinion in *Permian*, although it recognized the problems of the FPC and permitted area rate making, which dispensed with the creation of an adequate record for judicial review, which the Court certainly had in *Permian.* Furthermore, while the Tenth Circuit majority in discussing the APA specifically noted, "A more reliable test [for the record required in rule-making] is the congressional intent as contained in the specific statute" (at 851), yet nowhere did the Court discuss the "substantial evidence" standard of the Natural Gas Act, there and here involved.

90. Phillips Petroleum Co. v. FPC, 475 F. 2d 842, at 855–856 (10th Cir. 1973) (Seth, J., dissenting).

91. It is not, of course, for this court to make rules governing the procedures to be employed in FPC rate-making. Our

mechanism whereby adverse parties can test, criticize and illuminate the flaws in the evidentiary basis being advanced regarding a particular point. The traditional method of doing this is cross-examination, but the Commission may find it appropriate to limit or even eliminate altogether oral cross-examination and rely upon written questions and responses. In proceedings involving numerous parties, the Commission might find it expedient to screen the written interrogatories in the manner approved in International Harvest Co. v. Ruckelshaus.[92] It is also possible that the Commission could use evidence incorporated by reference from other proceedings.[93] But whatever procedure is followed, it must assure that the Commission has a substantial evidentiary basis for its findings and it must provide the court with an adequate record on review.

## V. Conclusion

We hold that the Federal Power Commission does not have jurisdiction to establish rates for the transportation of liquid hydrocarbons. We further hold that as to the Commission's action in regard to liquefiable hydrocarbons the cause must be remanded to the Commission for further proceedings. For the guidance of the Commission we summarize our reasons:

1. What started out as a general policy rule-making proceeding, for which the notice given by the Commission was probably adequate, was allowed to slide over into a proceeding fixing specific mandatory rates in which the required procedures, beginning with the notice of what was to be ultimately done by the Commission, were inadequate.

2. Even if jurisdiction had been properly asserted by the Commission over liquids, and even if we were to agree with the majority's rationale in *Phillips*[94] as to the adequacy of informal rule-making to set rates, the lack of fair notice and an adequate record on

---

comments here are presented by way of illustration. Whatever innovations the FPC may attempt, we believe that sound administrative practice demands that a more accurate record of proceedings be kept than was done in this case. The minutes provided this court are at best an outline of what actually occurred. This flaw is totally unnecessary and could easily have been remedied by simply preparing a transcript of the proceedings.

92. *See* footnote 48, *supra*, and accompanying text. Such submission would not be mere comments, but rather would constitute a type of written cross-examination.

93. It is possible that evidence introduced and tested in a separate proceeding could be relevant to a rate-making subsequently before the Commission. Such evidence, under some circumstances, could conceivably be incorporated into a rate-making without prejudicing the parties. For example, evidence regarding costs in a particular area could be incorporated into a record without requiring that it be submitted and tested by cross-examination (or whatever method is being employed) a second time. But in any situation in which the Commission wishes to incorporate evidence from another proceeding, it must give the interested

parties notice and an opportunity to comment on such evidence. This adoption by reference would have to include *all* the evidence on a particular point— not just that which supports the Commission's conclusions. The Commission would not be free to incorporate as evidence mere conclusions reached by the Commission in other proceedings.

By like token, the Commission would not be free to adopt factual assertions (such as settlement offers) which had not been subject to examination and testing by opposing parties. One of the most disturbing matters in the case at bar is that the very pipeline summary cost data, originally put forward as underpinning for a settlement proposal but relied on by the FPC here (App. 52) and in *Placid Oil*, *supra*, was in 9 out of 10 instances held too high by the Commission itself in later individual proceedings, as asserted in Mobil's brief (pp. 30–31) and admitted by the FPC in oral argument. So the FPC produced opposite results from the same data in different proceedings; twice the FPC credited the data, once the FPC discredited the data; Mobil was never given the opportunity to discredit the data.

94. *See* footnote 88, *supra*.

which the prices were set here would still require us to remand this case.[95]

3. The question as to why mandatory rates on liquefiables fixed by the FPC, instead of the previously satisfactory cost allocation attributable to both liquids and liquefiables, are now necessary was never faced squarely, certainly it was never articulated. The decision as to why rate-making for liquefiables is now necessary, if it is, should be logically the first to be made by the FPC on this remand.

4. The procedures followed in the introduction and examination of "evidence" did not permit a testing of that evidence by procedures sufficiently adversary in nature to provide a reasonable guarantee of its reliability.

5. In the type proceeding on which the Commission eventually embarked, the standard of evidence which a reviewing court must have before it to sustain the agency's action is "substantial evidence" as called for by the basic statute here involved, the Natural Gas Act. The procedures required to develop this "substantial evidence" are not necessarily the strict adversary procedures of sections 556 and 557 of the Administrative Procedure Act, but, considering the ultimate decision which the Commission issued, should have embraced considerably more in the way of adversary procedures than those simple requisites of section 553 which were assumed sufficient here.

 6. Owing to the inadequacies of the procedure followed and to the type of evidence relied upon by the Commission, we cannot find here in the whole record the substantial evidence necessary to sustain the Commission's action.

We therefore vacate the orders and remand the cause to the Federal Power Commission for further proceedings consistent with this opinion.

So ordered.

---

95. *See* text at pp. 1242–1245, and notes 10, 23, 39, 78 and 93.