**FIRST STATE BANK OF CLUTE, TEXAS, et al., Petitioners,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent.**

No. 76–3073

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

June 10, 1977.

---

* Rule 18, 5 Cir., see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

John E. Teed, Houston, Tex., C. Wayne Holder, Freeport, Tex., Charles T. Richardson, Clute, Tex., for petitioners.

James E. Scott, Atty., Board of Governors of the Fed. Reserve, John D. Hawke, Jr., Gen. Counsel, Washington, D. C., Ronald R. Glancz, Atty., Rex E. Lee, Asst. Atty. Gen., Appellate Sect., Dept. of Justice, Washington, D. C., for respondent.

Before THORNBERRY, RONEY and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This appeal raises the issues of whether substantial evidence supports the findings of the Board of Governors of the Federal Reserve System that the acquisition of a proposed new bank will not have significant anticompetitive effects and will not violate State branch banking laws. In addition, this case also raises the question whether a bank must be in operation before the Board may approve an application by a bank holding company to acquire the bank. The petitioners, three commercial banks in Brazoria County, Texas, are seeking review of an order of the Board of Governors of the Federal Reserve System ("Board"), dated July 1, 1976, approving the application of First Freeport Corporation ("Applicant"), to acquire Chemical National Bank, Clute, Texas, a proposed new bank ("New Bank"). The petitioners, as potential competitors of New Bank, are bringing this action for re- view under section 9 of the Bank Holding Company Act ("The Act"), 12 U.S.C. § 1848 (1970).

## I. The Facts.

On October 15, 1975, First Freeport Corporation filed an application with the Federal Reserve Bank of Dallas, pursuant to section 3(a)(3) of the Act, for Board approval to acquire New Bank, a proposed national bank for which the Comptroller of the Currency had preliminarily and conditionally granted a charter on December 4, 1972, after a proceeding in which the Petitioners intervened and participated. At the time of application, Applicant had one subsidiary bank, First Freeport National Bank, Freeport, Texas, located 8.3 miles from New Bank.

Following its usual procedures for reviewing an application, the Board established an extremely thorough administrative record before issuing its final order approving the proposed action. After reviewing the application and obtaining certain additional information, the Federal Reserve Bank of Dallas accepted the application for processing on October 28, 1975, and so notified Applicant, the Board, the appropriate bank supervisory agencies and the Antitrust Division of the Department of Justice. The Reserve Bank began processing the application pursuant to authority delegated to it by the Board.

On November 12, 1975, notice of the application was published in the Federal Register inviting all interested persons to comment. On November 21, 1975, Petitioners submitted substantive comments in opposition to the application and, as a result, the application was transferred by the Reserve Bank to the Board for processing.

The petitioners raised three objections to the application: (1) that since the Comptroller had granted a preliminary charter to New Bank conditioned on Board approval of Applicant's request to acquire New Bank, the Board was without authority to approve acquisition of such a conditionally chartered entity; (2) that the acquisition would substantially lessen competition in

the Brazosport Area, which they characterized as a market separate from Houston; and (3) that the acquisition would constitute branch banking in violation of Texas law. On December 5, 1975, in response to Petitioners' charges, the Applicant provided for the record data on the projected economic growth of the area, the growth of Petitioner Banks during the past decade, the need for a new bank in the area and facts refuting Petitioners' claims about branch banking. The Applicant also stated its view that Petitioners' argument concerning the Board's lack of authority had been previously litigated and conclusively found to be without merit.

Following the protest by Petitioners, the Reserve Bank conducted a field investigation to define the relevant banking market. The Reserve Bank concluded that the Freeport market was separate from the Houston market and consisted of Brazoria County with the exception of certain communities in the northern portion of the county. This study, which was included in a Reserve Bank memorandum of January 2, 1976, was presented to the Board together with the Reserve Bank's analysis of the competitive factors and the financial and managerial resources of the applicant and the convenience and needs of the community to be served. Copies were also provided to the Applicant and the Petitioners on January 7, 1976. On January 19, 1976, the Petitioners commented on the market study and agreed with the Reserve Bank's conclusion that the Freeport market is distinct from the Houston market.

On February 2, 1976, the Board's staff asked Applicant a series of detailed questions regarding the issue whether New Bank would be operated independently from Freeport Bank or as a branch thereof. The Applicant responded to this inquiry on February 10, 1976, providing the Board's staff with additional and detailed information about New Bank's proposed officers and directors, its correspondent relationships, its advertising and other factors relating to the independence of New Bank from Freeport Bank. On February 23, 1976, the

Petitioners commented upon Applicant's response, and contended that New Bank's Board of Directors and Officers would not be independent of Freeport Bank. They contended further that Freeport and New Bank would be operated as a single institution and viewed as such by the public. Despite these objections, on February 20, 1976, the Comptroller recommended approval of the application and advised that the competitive considerations were favorable.

On May 4, 1976, the Reserve Bank submitted to the Board a memorandum in which the Reserve Bank analyzed various factors that supported its conclusion that New Bank would not be operated in a unitary fashion with Freeport Bank and would not be a branch in violation of Texas law. In addition, the Reserve Bank forwarded to the Board an opinion of the Attorney General of the State of Texas that acquisition of a bank by a bank holding company does not in itself violate the Texas law on branch banking. On July 1, 1976, the Board granted its approval for Applicant to acquire New Bank.

## II. *Summary of the Board's July 1, 1976 Order.*

In its order, attached hereto as Appendix A, the Board defined the relevant market area as Brazoria County with the exception of certain communities of the northern portion of the county. The Board determined that there were twelve banks in the relevant market including Applicant's subsidiary bank, Freeport Bank, which is the largest bank in the market holding approximately 19.8 per cent of the deposits in the market. The Board concluded that acquisition of New Bank, a proposed new bank not yet in operation, would not eliminate any existing competition. Furthermore, the Board also determined that Applicant's and New Bank's financial and managerial resources and future prospects were satisfactory. With respect to convenience and needs considerations, the Board found that these factors lent some weight toward approval since New Bank would be capable of offering a full complement of banking services to its customers.

In response to the objections raised by Petitioners, the Board concluded that it had authority to approve the acquisition by Applicant of the proposed New Bank whose charter the Comptroller had approved on condition of Board approval of New Bank's becoming a subsidiary of Applicant. The Board also determined that the acquisition would not contravene the Texas branch banking law. Moreover, the Board examined Petitioners' contentions that the market was not attractive for entry of a new bank and that any new entrant would grow at the expense of existing banks in the market. Based on evidence contained in the record, the Board concluded that the market could be expected to support a new bank and that the proposed acquisition would have no significant adverse effects on the area's existing banks.

### III. *Analysis of Arguments on Appeal.*

■ Our review is clearly limited to a determination of whether substantial evidence supports the findings by the Board. Section 9 of the Act, 12 U.S.C. § 1848 (1970), states that "[t]he findings of the Board, if supported by substantial evidence, shall be conclusive." This court has joined other circuits in recognizing the narrow scope of review prescribed by Congress with respect to findings of the Board under the Bank Holding Company Act. *Alabama Association of Insurance Agents v. Board of Governors,* 533 F.2d 224, 246 (5th Cir. 1976); *North Hills Bank v. Board of Governors,* 506 F.2d 623 (8th Cir. 1974); *First Wiscon-*

*sin Bankshares Corporation v. Board of Governors,* 325 F.2d 946 (7th Cir. 1963). With this standard of review in mind, we proceed to examine Petitioners' claims that certain aspects of the Board's order are not supported by substantial evidence.

### A. *The Finding that Chemical National Bank Will Not be Operated in a Unitary Fashion.*

■ In making the determination that the acquisition would not violate the Texas branch banking law the Board relied on eleven factors established in the record.[1] The Petitioners allege that two of these factors were not supported by substantial evidence. The Petitioners first contend that the directors of New Bank will not generally be separate from Freeport Bank. The Board, however, received substantial evidence from which it could have reasonably concluded that the directors of New Bank would generally be separate from those of the Freeport Bank. In a letter of February 10, 1976, the Applicant assured the Board that the Directors of New Bank will number twelve, of whom a majority of seven would be individuals selected from the relevant market. None of these seven directors would be directors or officers of Freeport Bank or Applicant. Furthermore, the Applicant assured the Board that one officer and two directors of Freeport would resign their positions in order to become officers or directors of New Bank. The Board concluded that only two of the

---

1. These factors may be summarized as follows:

(1) New Bank will be a separate corporation;

(2) New Bank will have its own capital stock and a loan limit based upon such stock that will be lower than the loan limit of Freeport Bank;

(3) New Bank's operations will be conducted primarily by its own officers;

(4) the board of directors of New Bank will be generally separate from the Boards of Applicant and Freeport Bank;

(5) the officers and employees of New Bank will not directly perform any services for customers of Freeport Bank, except those generally provided for customers of other area banks;

(6) the officers and employees of Freeport Bank will not perform any services for cus-

tomers of New Bank, except those generally provided for customers of other area banks;

(7) customers of New Bank and Freeport Bank will be able to deposit and withdraw funds only at their respective institutions and thus will not be able to treat the two entities as a single banking institution;

(8) New Bank and Freeport Bank have distinctly different names that identify them in the public eye as separate banks;

(9) New Bank and Freeport Bank will not be identified in advertising as a united institution;

(10) New Bank and Freeport Bank will each maintain separate books of account and forms; and

(11) New Bank will use its own stationery and issue its own distinctive checks.

twelve directors of New Bank would also be directors of Freeport Bank. Based upon this evidence, we affirm the Board's conclusion that the presence of these two common directors on two different twelve member boards of directors was insufficient to establish that the two banks will be operated as a single unit.

■ The Petitioners also dispute the Board's conclusion that New Bank's operations will be conducted primarily by its own officers. The Petitioners are apparently ignoring the representation of the Applicant, relied upon by the Board, that two of New Bank's officers would resign their positions with the Applicant upon assuming their new duties. In support of their position, the Petitioners point out that the president of Freeport Bank will also serve as president of New Bank. The record shows, however, and the Board concluded, that this officer, Mr. David, would serve as president of both institutions only on a temporary basis until another officer (who had never served as chief executive of a bank) gains the necessary experience for the position. The Applicant explained to the Board that Mr. David's role would be both temporary and to some degree titular with respect to the day-to-day operations of New Bank. We conclude, therefore, that the commitments of the Applicant and the information considered by the Board in the administrative record amply and reasonably support the Board's conclusions that the operations of New Bank are to be conducted primarily by its own officers.

B. *The Finding That the Acquisition Would Not Create a Monopoly or Substantially Lessen Competition.*

■ In evaluating the competitive considerations of the proposed acquisition, the Board first defined the relevant market area in which New Bank is located. The Bank relied principally upon the recommendations of the Comptroller of the Currency and on the Reserve Bank, particularly on a Reserve Bank study that included an evaluation of commuting patterns, geographic integration, economic interdependence and community identification. Of the twelve banks in the market, the Board found that Applicant's only subsidiary bank, Freeport Bank, was the largest with control of 19.8 percent of total deposits in the market. Although Petitioner's Lake Jackson Bank and Brazosport Bank, the second and third largest banks in the market, controlled 12.2 and 11.9 percent of total deposits, respectively, the record also showed that Freeport Bank's share of deposits had declined since 1965 whereas those of Petitioner Banks had increased substantially. Based on these and other facts set forth in an exhaustive administrative record, the Board concluded that Petitioner Banks are strong competitors and the market is not dominated by a single bank.[2]

The Board made further findings concerning competition, in which it concluded that the acquisition by Applicant of a proposed New Bank would not eliminate any existing competitor in the market, and that it would not immediately or necessarily increase Applicant's share of market deposits or increase concentration in the market. In support of their contention that the acquisition would reduce competition, the Petitioners take issue with the market share analysis of the Board, as well as the projections of growth in the market area. After a review of the briefs and the record, however, we find sufficient evidence to support the Board's conclusions that this *de novo* acquisition will have a procompetitive impact. *See Alabama Association of Insurance Agents, supra* at 249.

C. *Authority of the Board to Approve the Acquisition by a Bank Holding Company of a Proposed New Bank.*

■ The Petitioners argue that because the Bank Holding Company Act defines "bank" in terms of an existing operational institution, 12 U.S.C. § 1841(c), the Board

---

2. The Board also noted that Applicant ranks 212th among banking organizations in the state.

was without jurisdiction to approve Applicant's acquisition of the proposed, but not yet operating, New Bank. They contend that no charter had been granted to New Bank by the Comptroller of the Currency at the time of the Board's consideration of the acquisition since the Comptroller's "preliminary approval" was expressly conditioned on acquisition of New Bank by the Applicant.[3] In this case, the Comptroller of the Currency conditioned his approval of the charter on acquisition by the applicant. When the Board subsequently approved the acquisition, the charter became effective and shares of the Bank were issued. Petitioners object to this procedure, which they characterize as a "bootstrap" approval, on the ground that it exceeds the Board's statutory authority under the Act. This argument must fall of its own weight. We agree with the conclusion of the Eighth Circuit in *Gravois Bank v. Board of Governors*, 478 F.2d 546 (8th Cir. 1973), wherein the court adopted the Board's historical construction of the statute as allowing approval of the acquisition of new banks by bank holding companies.

AFFIRMED.

## APPENDIX A

### FEDERAL RESERVE SYSTEM

### FIRST FREEPORT CORPORATION

Order Approving Acquisition of Bank

First Freeport Corporation, Freeport, Texas, a bank holding company within the meaning of the Bank Holding Company Act ("Act"), has applied for the Board's approval under § 3(a)(3) of the Act (12 U.S.C. § 1842(a)(3)) to acquire all of the voting shares (less directors' qualifying shares) of Chemical National Bank, Clute, Texas ("Bank"), a proposed new bank.

Notice of the application, affording opportunity for interested persons to submit comments and views has been given in accordance with § 3(b) of the Act. The time for filing comments and views has expired, and the Board has considered the application and all comments received, including those submitted on behalf of three Texas banks: The Lake Jackson Bank of Lake Jackson, Lake Jackson, [*sic*] Brazosport Bank of Texas, Freeport, and First State Bank, Clute (hereinafter referred to as "Protestants"), in light of the factors set forth in § 3(c) of the Act (12 U.S.C. § 1842(c)).

Applicant, the 212th largest banking organization in Texas, controls one bank with aggregate deposits of $35.9 million, representing approximately .8 of one per cent of the total commercial bank deposits in the State.[1] Since Bank is a proposed new bank, its acquisition by Applicant would neither eliminate any existing competition nor immediately increase Applicant's share of commercial bank deposits.

Bank is to be located in Clute, Texas, and will compete in the Freeport banking market (the relevant banking market).[2] Appli-

---

3. The necessity for this conditional approval procedure was explained in *Gravois Bank v. Board of Governors*, 478 F.2d 546 (8th Cir. 1973), where the Court stated as follows:

> The applicable statute requires that the identity of the shareholders in a proposed bank be set out in the application for a charter. 12 U.S.C. § 22. Moreover, in granting the charter, the Comptroller is obligated to determine that the aforementioned condition, among others, is met. 12 U.S.C. § 26. Accordingly, where the prospective shareholder must also gain approval of the Board to acquire the stock, it is necessary for the Comptroller to condition the granting of the charter on subsequent approval of the acquisition by the Board. The Comptroller had independently made his determination as to the identity of

the shareholders and, in our view, the "condition" does not represent an unlawful delegation of this duty. It merely insures that his determination will be carried out. 478 F.2d at 548–49.

1. All banking data are as of June 30, 1975, adjusted to reflect bank holding company formations and acquisitions approved as of May 31, 1976.

2. The Freeport banking market is approximated by Brazoria County exclusive of the communities of Alvin and Pearland and their immediate environs. The Freeport banking market was previously included in the Houston banking market; however, in response to Protestants' contentions that the Freeport area represented a distinct banking market, the Federal

cant's subsidiary bank, First Freeport National Bank, located 8.3 miles northwest of Bank, is the largest of twelve banks operating in the market and holds approximately 19.8 per cent of market deposits, while Protestants Lake Jackson Bank and Brazosport Bank are the second and third largest banks in the market accounting for 12.2 and 11.9 per cent of market deposits, respectively. Since Bank is a proposed new bank, its acquisition by Applicant would not eliminate any existing or potential competition. In addition, there is no evidence to indicate that Applicant's proposal is an attempt to preempt a site before there is a need for a bank. On the basis of the above and other facts of record, the Board concludes that competitive considerations are consistent with approval of the application.

The financial condition and managerial resources and future prospects of Applicant and its subsidiary bank are regarded as satisfactory. Bank has no operating financial history; however, it will be opened with adequate capital and its prospects as a subsidiary of Applicant appear satisfactory. Accordingly, considerations relating to the banking factors are consistent with approval. Considerations relating to the convenience and needs of the community to be served lend some weight toward approval of the application since Bank will be capable of offering a full complement of banking services to its customers.

During the course of its consideration of this application, the Board has considered the comments submitted on behalf of Protestants. Protestants have advanced several arguments relating to the Board's jurisdiction to consider the subject application. In brief, Protestants assert that the Board's jurisdiction does not exist since Bank is merely a proposed bank rather than an operating institution. Further, the Comptroller of the Currency was not authorized to condition his granting of Bank's charter on the acquisition of Bank by Applicant. Both of Protestants' contentions have been rejected by the courts. *Gravois Bank v. Board of Governors*, 478 F.2d 546 (8th Cir. 1973); *see Whitney National Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). Accordingly, the Board finds these arguments to be without merit.[3]

Protestants also contend that affiliation of Applicant with Bank would contravene Texas law prohibiting branch banking (Tex. Const. Art. XVI § 16). The Board has stated that a State's restrictive branch banking laws are not automatically applicable to bank holding company operations. In a given case the Board examines the facts to determine whether a particular acquisition of a bank holding company would constitute an illegal branch under State law. If the Board determines that a violation of State law would result, it is required to disapprove the transaction. *Whitney National Bank v. Bank of New Orleans*, 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), *rev'd on other grounds*, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965); *Gravois Bank v. Board of Governors*, 478 F.2d 546 (8th Cir. 1973).

The Board notes that the Office of the Comptroller of the Currency has granted preliminary approval for the charter of Bank, following a hearing, apparently concluding that Bank would not be an illegal branch under Texas law. The facts of record in this case indicate that Bank will be a separate corporation, with its own capital stock and a loan limit based on such capital stock; that Bank's operations will be conducted primarily by its own officers; that

---

Reserve Bank of Dallas undertook a field study of the area. As a result, it was determined that the Freeport banking market was a separate and distinct banking market.

3. Protestants also claim, that section 3(b) of the Act (12 U.S.C. § 1842(b)) restricts the Comptroller's chartering authority. This provision of the Act refers to the Board's obligation to solicit the Comptroller's views with regard to applications by bank holding companies to acquire a national bank as a proposed subsidiary pursuant to section 3 of the Act. If the Comptroller recommends disapproval of an application, within the 30 days after receipt of the Board's notice the Board must hold a formal hearing on the application.

Bank's board of directors will be generally separate from the boards of Applicant and of Freeport Bank and will exercise independent judgment with respect to the management of Bank; that Bank's officers and employees will not directly perform any services for customers of Freeport Bank other than those services that would be provided for customers of other area banks, such as check cashing, and the same is true of Freeport Bank's officers and employees with regard to customers of Bank; that Bank's customers will be able to deposit and withdraw their funds only with respect to accounts in Bank and will not be able to effect a deposit or withdrawal from Bank at Freeport Bank; and the same is true of Freeport Bank's customers who will likewise not be able to effect a deposit or withdrawal from Freeport Bank at Bank; that Bank and Freeport Bank will be advertised as being members of the same bank holding company system but that they will not be identified as united institutions; that Bank will maintain its own books of account, use its own stationery and issue its own distinctive checks and forms; and that Bank's name will be different from the name of Freeport Bank.

In order to prevail on the branching issue, "It must be shown that 'in substance' a bank 'is doing business through the instrumentality of' the affiliate institution which constitutes the alleged branch, 'or vice versa, in the same way as if the institutions were one.'" *Independent Bankers Association of Georgia v. Board of Governors of the Federal Reserve System,* 170 U.S.App. D.C. 278, 516 F.2d 1206 (1975). In view of the foregoing, and having considered the comments of the Protestants and all the other facts of record, the Board concludes that Bank will not be operated in a unitary fashion with Applicant's banking subsidiary and thus this proposal will not contravene Texas' branch banking law.

Protestants further contend that the Freeport banking market is not particularly attractive for *de novo* entry because little growth in the area can be expected. Consequently, Protestants assert, it is doubtful that Bank can become a viable independent banking institution. The Board has reviewed the facts of record, including the past and projected growth of the economy of the area, and finds that the market can reasonably be expected to support an additional banking alternative. This is especially so in light of the market's higher than average population growth, high income per household, and anticipated strong business development. While the decision to establish a new bank almost always involves some measure of risk, the Board is unable to conclude that Applicant's proposal involves more than the usual entrepreneurial risks inherent in such a proposal.

Finally, Protestants assert that any substantial growth by Bank would be at the expense of the area's existing banks. Applicant has defined a service area for Bank which overlaps the service areas of three neighboring banks. These banks have sustained growth rates of over 50 per cent on the average in both deposits and loans over the past five years. In view of the growth pattern of the area's economy and the commercial and industrial activity occurring near Bank's proposed site, it is the Board's determination that Applicant's entry will have no significant adverse effects on any bank in the market or impair their ability to remain viable banking organizations.

In view of the foregoing discussion and having considered the facts of record and all the comments of Protestants in light of the statutory factors the Board must consider under § 3(c) of the Act, it is the Board's judgment that consummation of the subject proposal would be in the public interest and that the application to acquire Bank should be approved.

On the basis of the record, the application is approved for the reasons summarized above. The transaction shall not be made (a) before the thirtieth calendar day following the effective date of this Order or (b) later than three months after that date, and (c) Chemical National Bank, Clute, Texas, shall be opened for business not later than six months after the effective date of this

Order. Each of the periods described in (b) and (c) may be extended for good cause by the Board, or by the Federal Reserve Bank of Dallas pursuant to delegated authority.

By order of the Board of Governors,[4] effective July 1, 1976.

(s) (Signed) J. P. Garbarini
J. P. Garbarini
Assistant Secretary of the
Board

[SEAL]

---

4. Voting for this action: Chairman Burns and Governors Coldwell, Jackson, Partee and Lilly. Absent and not voting: Governors Gardner and Wallich.

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.,* 5 Cir. 1970, 431 F.2d 409, Part I.