**FARMERS AND MERCHANTS BANK OF LAS CRUCES, NEW MEXICO, Petitioner,**

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**First New Mexico Bankshare Corp., Intervenor.**

**No. 76–1367.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1977.

Decided Nov. 7, 1977.

As Amended Dec. 22, 1977.

William L. Lutz, Las Cruces, N. M., for petitioner.

Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and John D. Hawke, Jr., Gen. Counsel, Bd. of Governors of the Federal Reserve System, Washington, D. C., were on the brief, for respondent. Michael Kimmel, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent.

Edwin B. Spievack and Ian D. Volner, Washington, D. C., were on the brief, for intervenor.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

On March 29, 1976, the Board of Governors of the Federal Reserve System (hereafter "Board"), acting pursuant to the Bank Holding Company Act of 1956, 12 U.S.C. § 1841 et seq., approved the application by the First New Mexico Bankshare Corporation (hereafter "Bankshare"), a bank holding company of Albuquerque, New Mexico, to acquire all of the stock of the Bank of Las Cruces, New Mexico, a proposed new national bank (hereafter "New Bank"). From the approval of such acquisition, the Farmers and Merchants Bank of Las Cruces (hereafter "FMB") asserts that it is an aggrieved party and appeals in accordance with the right accorded it by the Bank

Holding Company Act of 1956, as amended, which provides as follows:

> Any party aggrieved by an order of the Board under this chapter may obtain a review of such order in the United States Court of Appeals within any circuit wherein such party has its principal place of business, or in the Court of Appeals in the District of Columbia, by filing in the court, within thirty days after the entry of the Board's order, a petition praying that the order of the Board be set aside. . . . Upon the filing of such petition the court shall have jurisdiction to affirm, set aside, or modify the order of the Board and to require the Board to take such action with regard to the matter under review as the court deems proper. *The findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive.*

12 U.S.C. § 1848 (1970) (emphasis added).[1]

This appeal presents two issues. The first is whether the Board is required to hold a hearing so that FMB can discover evidence and cross-examine the applicant Bankshare. Related to this issue is the question of whether an adequate *opportunity* for discovery of evidence and cross-examination was provided, irrespective of whether a formal hearing was required. The second issue is whether the Board's findings in favor of approval of the application are supported by substantial evidence.

## I. THE RELEVANT STATUTES

The Bank Holding Company Act of 1956, as amended, prohibits a bank holding company from acquiring ownership or control of a bank without the approval of the Board.[2] Pursuant to the Board's implementing regulations, a bank holding company seeking such an acquisition must first file an application with a Federal Reserve Bank, which investigates the application and reports the facts and submits a recommendation to the Board.[3] Then, after notice of receipt of the application is published in the *Federal Register*,[4] the application, pursuant to 12 U.S.C. § 1842(b), is forwarded to the Comptroller of the Currency if the bank to be acquired is a national bank.[5]

1. In *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), the Supreme Court interpreted substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939), the Court stated that "it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." In determining whether facts are supported by substantial evidence, the entire record must be considered and not merely the evidence that tends to support the finding. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). *See generally Consolo v. Federal Maritime Commission,* 383 U.S. 607, 619–21, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

2. 12 U.S.C. § 1842(a)(3) (1970).

3. 12 C.F.R. § 262.3(b)–(c) (1977).

4. 12 C.F.R. § 262.3(g)(1) (1977).

5. 12 U.S.C. § 1842(b) (1970) provides as follows:

> Upon receiving from a company any application for approval under this section, the Board shall give notice to the Comptroller of the Currency, if the applicant company of any bank the voting shares or assets of which are sought to be acquired is a national banking association or a District bank, or to the appropriate supervisory authority of the interested State, if the applicant company or any bank the voting shares or assets of which are sought to be acquired is a State bank, and shall allow thirty days within which the views and recommendations of the Comptroller of the Currency or the State supervisory authority, as the case may be, may be submitted. If the Comptroller of the Currency or the State supervisory authority so notified by the Board disapproves the application in writing within said thirty days, the Board shall forthwith give written notice of that fact to the applicant. Within three days after giving such notice to the applicant, the Board shall notify in writing the applicant and the disapproving authority of the date for commencement of a hearing by it on such application. Any such hearing shall be commenced not less than ten nor more than thirty days after the Board has given written notice to the applicant of the action of the disapproving authority. The length of any such hearing shall be determined by the Board, but it shall afford all interested parties a reasonable opportunity to testify at such

The statute requires the Board to "allow thirty days within which the views and recommendations of the Comptroller . . . may be submitted."[6] The Comptroller may disapprove the proposal, in which case the Board is required to hold a hearing after giving written notice to the applicant. This hearing "shall afford all interested parties a reasonable opportunity to testify at such hearing."[7] However, if the Comptroller *approves* the proposal for acquisition, the statute does not require that a hearing be held.

The rationale for requiring a hearing when the Comptroller disapproves the application but not when he approves the application is vividly apparent in legislative history.[8] In short, Congress sought both to ensure that the true merits of an application would be elicited in the event of disapproval and to facilitate more informal proceedings where the Comptroller (or state bank supervisory authority) approves the application. This procedure demonstrates that Congress believed it could place considerable reliance upon the intimate knowledge of the banking situation that the close, regular supervision and regulation of banks gave to their federal and state supervisors.

The factors governing the Board's determination of whether to grant or deny the application for approval of the transaction are stated in 12 U.S.C. § 1842(c) (1970):

The Board shall not approve—

(1) any acquisition or merger or consolidation under this section which would result in a monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(2) any other proposed acquisition or merger or consolidation under this section whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint or [of] trade, unless it finds that the anticompetitive effects of the proposed transactions are

---

hearing. At the conclusion thereof, the Board shall by order grant or deny the application on the basis of the record made at such hearing.

**6.** *Id.*

**7.** *Id.*

**8.** *See Northwest Bancorporation v. Board of Governors*, 303 F.2d 832, 843 (8th Cir. 1962):

[T]he legislative history . . . indicates that Congress intended no hearing if the Comptroller . . . expressed no written disapproval. See Senate Rep. No. 1095 on S. 2577, 84th Congress, 2nd Session, 1956, U.S. Code Congressional and Administrative News, pp. 2482, 2490.

" * * * It affords the bank supervisory authorities an opportunity to file with the Federal Reserve Board a formal recommendation that the application be denied. But it also provides that if such a recommendation is made, the Federal Reserve Board must provide a hearing of record after due notice at which the testimony of all interested parties may be received, including, of course, the applicant and the disapproving bank supervisory authority. * * *

"This procedure . . . should afford opportunity for developing the true merits of an application upon due consideration of the facts, in instances where the bank supervisory authority involved expresses written disapproval of the application. It also assures adequate recourse to court proceedings for an aggrieved party.

"At the same time, it leaves the *Federal Reserve Board free to proceed in a more informal manner in handling an application as to which the appropriate bank supervisory authority expresses no written disapproval.*" [Emphasis supplied by the court.]

When the applicable legislation was before the Congress, Senator Robertson, who introduced the bill whose text became the Bank Holding Company Act of 1956, made it clear that Congress was not requiring hearings when the Comptroller approved the acquisition:

It must be remembered that for nearly 100 years Federal bank supervisory agencies have acted upon applications for charters and branches of banks without formal hearings. This practice has worked satisfactory [sic] not only for the bank agencies but for all parties affected.

Under my bill the parties in any event would be afforded an opportunity to submit with their applications whatever written briefs or arguments they might desire. They would also be afforded, if desired, an opportunity to [sic] discussion of the matter with the Federal Reserve Board and its staff.

102 Cong.Rec. 6958 (1956).

clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

In every case, the Board shall take into consideration the financial and managerial resources and future prospects of the company or companies and the banks concerned, and the convenience and needs of the community to be served.

## II. THE FACTS

On July 17, 1975, the Comptroller of the Currency granted preliminary approval for the charter for New Bank. The approval was subject to several conditions, including one that Bankshare hold all of the stock of New Bank except directors' qualifying shares (R. 10; J.A. 11–12). The decision of the Comptroller to approve the charter on the terms stated followed a hearing in which the need for another bank in Las Cruces and the relevant banking area of Dona Ana County was thoroughly considered (R. 239–416; J.A. 70–248). FMB and the two other commercial banks in Las Cruces participated in that hearing and were afforded an opportunity to offer testimony and to cross-examine Bankshare's witnesses on relevant issues (R. 243–46; J.A. 74–77).

Thereafter, Bankshare on August 20, 1975 applied to the Board for approval of acquisition of New Bank's shares. Its application was reviewed in the first instance by the regional Federal Reserve Bank. The 219-page application set forth in detail the alleged need of the community for the bank and the convenience that this new bank would afford the community (R. 1–219; J.A. 8–61). The application also included a three-year operations projection covering anticipated deposits, losses, and profits, an economic feasibility study, New Bank's ex-

pected contribution to the convenience and needs of the community, and a statement dealing with the plan's effect on competition. This application concluded that the economy and population of the relevant banking area was growing and would continue to grow, that the new proposed bank was economically feasible, and that no "undue injury" would be caused to existing local banks. On September 23, 1975, FMB filed with the regional Reserve Bank a protest to the application and requested a hearing (R. 417–20; J.A. 249–54).

On September 26, 1975, the Reserve Bank transmitted the application to the Board (R. 427). On October 16, 1975, the board informed FMB that a hearing on an application is required only in situations where the Comptroller disapproves the application, unless the Board deems a hearing desirable (R. 432; J.A. 255–56). Petitioner was requested to supply information as to the nature and scope of the issues that would be the subject of a hearing and why a written presentation would not be adequate. FMB responded that hearing and discovery procedures were necessary in order to develop the record and that five issues would be considered.[9]

On November 3, 1975, the Reserve Bank forwarded a detailed report to the Board on the effects of the acquisition (R. 466–81; J.A. 273–308). The Board requested additional information of Bankshare, which was received and was transmitted to FMB (R. 489–503; J.A. 315–33). On March 1, 1976, the Comptroller recommended approving the transaction. Against this background and accumulation of data, the Board on March 29, 1976 decided that the record was ample, approved Bankshare's acquisition plans, and denied petitioner's request for a hearing (R. 520–27; J.A. 347–54).

---

**9.** According to FMB, the five issues would include: (1) the propriety of the loan transaction to secure capital to purchase the stock of New Bank; (2) whether acquisition of New Bank will violate the prohibitions against statewide branch banking in New Mexico; (3) whether the proposed acquisition will lessen competi-

tion in New Mexico or be in restraint of trade; (4) whether New Bank will offer any new services to the public or satisfy needs not being met by existing banks; and (5) whether the Las Cruces area is "overbanked." (R. 443–44, J.A. 271–73).

In its order approving the acquisition, the Board evaluated relative market shares in the relevant market, which it found to be the area around Las Cruces, and on the basis of the facts in the record, concluded that the competitive effects of the transaction were consistent with and lent some weight toward approval of the acquisition (R. 522; J.A. 349). The Board considered the financial and managerial resources of the applicant and the needs of and convenience to the community to be served, and concluded that these factors also lent weight toward approval (R. 522–23; J.A. 349–50). The Board also evaluated protestant's contentions that Bankshare's acquisition of New Bank would be inconsistent with New Mexico law restricting branch banking (N.M.Stat.Ann. § 48–2–17 (1953)) and found that the affiliation of Bankshare with New Bank would not contravene state law (R. 523–25; J.A. 350–52). The Board also found that Bankshare's initial entry into the Las Cruces market would be by means of a *de novo* acquisition and would not have an adverse effect on competition or concentration within New Mexico (R. 525; J.A. 352). The Board finally found that the Las Cruces area could support an additional bank and that New Bank would serve special local needs (R. 525–26; J.A. 352–53).

## III.  THE ISSUES ON APPEAL

■ A.  *Right to Hearing.*—Petitioner contends that the Board is required to hold a hearing so that FMB can discover evidence and cross-examine applicant-Bankshare. Courts have uniformly held that the legislative history of the Bank Holding Company Act of 1956 demonstrates Congress intended no hearing if the Comptroller expressed no written disapproval of the transaction. *Northwest Bancorporation v. Board of Governors of Federal Reserve System,* 303 F.2d 832, 843 (8th Cir. 1962); *Kirsch v. Board of Governors of Federal Reserve System,* 353 F.2d 353, 356 (6th Cir. 1965). And when the Board recommends

approval of an application for acquisition, the uniform decisional authority holds that a hearing is not statutorily required. *Grandview Bank & Trust Co. v. Board of Governors of Federal Reserve System,* 550 F.2d 415, 421 (8th Cir.), cert. denied, —— U.S. ——, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977); *Bank of Boulder v. Board of Governors of Federal Reserve System,* 535 F.2d 1221, 1225 (10th Cir. 1976); *Commercial National Bank of Little Rock v. Board of Governors of Federal Reserve System,* 451 F.2d 86, 90–91 (8th Cir. 1971); *Kirsch v. Board of Governors of Federal Reserve System, supra,* at 356; *First Wisconsin Bankshares Corp. v. Board of Governors of Federal Reserve System,* 325 F.2d 946, 948, 960 (7th Cir. 1963); *Northwest Bancorporation v. Board of Governors of Federal Reserve System, supra,* at 842–44. Furthermore, courts have held that parties in petitioners' position have no constitutional right to a hearing. *Grandview Bank & Trust Co. v. Board of Governors of Federal Reserve System, supra,* at 421; *Bank of Boulder v. Board of Governors of Federal Reserve System, supra,* at 1224–5; *Commerce National Bank of Little Rock v. Board of Governors of Federal Reserve System, supra,* at 90–91; *Kirsch v. Board of Governors of Federal Reserve System, supra,* at 356; *First Wisconsin Bankshares Corp. v. Board of Governors of Federal Reserve System, supra,* at 960; *Northwest Bancorporation v. Board of Governors of Federal Reserve System, supra,* at 842–43. We perceive no reason to vary from these decisions, and therefore conclude that FMB has no statutory or constitutional right to a hearing before the Board.

■ Petitioner, however, also contends that it was afforded an inadequate *opportunity* to discover evidence and cross-examine Bankshare, irrespective of whether a formal hearing was required. In effect, petitioner contends that had it been allowed to use discovery procedures and to cross-examine Bankshare in a hearing before the Board, then it would have elicited facts to substan-

tiate its challenges. This perception of the procedure would require a hearing in every case in which a party asserted a deficiency in an applicant's proposal. Clearly, this procedure was not contemplated by Congress when it required a hearing *only* in those cases where the Comptroller disapproves the application or where the Board considers a hearing otherwise desirable. It would be inconsistent with the statutory scheme to require the Board in any case before it to hold a hearing when it has concluded from the presentation made that no material issues of fact are presented. Similarly, it would be inconsistent with this scheme to allow a protestant to search for a bona fide claim which is not sufficiently identified as presenting a justification for holding a hearing. If a protestant has the opportunity at some time, such as in a hearing before the Comptroller as was the situation here, to ask questions, to present evidence, and to suggest possible disputed questions of fact, and if this presentation lacks the force necessary to raise a material disputed question of fact, then a later hearing such as that requested by petitioner is superfluous.

Petitioner points to several cases which it contends support its position that a hearing before the Board is mandated in this case because petitioner was not afforded an adequate opportunity to seek out information that would substantiate its challenges. Petitioner cites *National Broadcasting Co. v. Federal Communications Commission,* 124 U.S.App.D.C. 116, 362 F.2d 946 (1966), *Citizens for Allegan County, Inc. v. Federal Power Commission,* 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969), *Independent Bankers Association of Georgia v. Board of Governors of Federal Reserve System,* 170 U.S. App.D.C. 278, 516 F.2d 1206 (1975), and *Patagonia Corp. v. Board of Governors of Federal Reserve System,* 517 F.2d 803 (9th Cir. 1975), as authority for the proposition that a hearing is required in this case. These cases are inapposite, as they involve situations where the applicable statute explicitly provided for a hearing, whereas in this case, as already noted, the statute does not require a hearing.

Petitioner also cites *Mobil Oil Corp. v. Federal Power Commission,* 157 U.S.App. D.C. 235, 483 F.2d 1238 (1973), where we considered what type of procedures must be employed to satisfy the "substantial evidence" requirement of the Natural Gas Act, 15 U.S.C. § 717r(b) (1970). We stated that "the procedures must provide some mechanism for interested parties to introduce adverse evidence and criticize evidence introduced by others." 157 U.S.App.D.C. at 255, 483 F.2d at 1258 (emphasis omitted). We also stated that "whatever procedure is followed, it must assure that the Commission has a substantial evidentiary basis for its findings and it must provide the court with an adequate record on review." 157 U.S. App.D.C. at 260, 483 F.2d at 1263. FMB queries whether the procedures employed in this case satisfy the *Mobil Oil* standard. We hold that they do.

While the Board did not hold a formal hearing, the Comptroller did hold a hearing, at which FMB was allowed to participate, to produce its own witnesses, and to cross-examine Bankshare's witnesses (R. 243–46; J.A. 74–77). Petitioner claims that it was entitled to know and meet the evidence in favor of Bankshare's application, but this was precisely what was afforded FMB in the hearing before the Comptroller. It is true that FMB did not get to discover all that it wished, but it did have the opportunity to state what types of information it wanted. FMB submitted written materials and data which were reviewed by the Board (R. 417–21, J.A. 249–54; R. 434–45, J.A. 257–73). The Board reviewed the record of the Comptroller's hearing and considered the requests and submissions of FMB. Since the decision of the Board to approve Bankshare's application cannot be set aside as not being based on substantial evidence, the denial of FMB's requests for discovery are properly viewed as not jeopardizing the adequacy of the Comptroller's hearing. This hearing was sufficiently adjudicative and adversarial to fulfill the requirements

of *Mobil Oil.* Indeed, there is no reason to believe that the hearing before the Comptroller was less extensive than that which would have been held before the Board itself. *Mobil Oil* does not require that any particular procedure be employed, but only that some device be provided which permits the testing and elucidation of the relevant data. *See First National Bank of Fairbanks v. Camp,* 151 U.S.App.D.C. 1, 19, 465 F.2d 586, 604, *cert. denied,* 409 U.S. 1124, 93 S.Ct. 936, 35 L.Ed.2d 255 (1972). In this case, the Comptroller's hearing met that requirement.

Petitioner also argues that even if we decide that petitioner is not entitled to a hearing before the Board, it is nevertheless entitled to "prehearing discovery" to elicit facts with which to demonstrate the need for or desirability of a hearing. We need not reach this question, since, whether or not petitioner was entitled to such discovery, review of the record convinces us that petitioner suffered no actual prejudice from the failure of the Board to permit such discovery. *See NLRB v. Rex Disposables,* 494 F.2d 588, 592 (5th Cir. 1974).

The statute vests in the Board the power to approve such applications in its sound discretion after more informal proceedings than those requested by petitioner. In the absence of a showing that substantial unanswered questions of a material nature remained at the conclusion of the informal process, the decision of the Board not to have a hearing should not be disturbed. *See Whitney National Bank v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 420–21, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). We cannot say that the Board abused its discretion here by denying petitioner a formal hearing or discovery.

■ B. *The Substantial Evidence Requirement.*—At oral argument, the determination of the Board was ably attacked by counsel who exhibited a thorough knowledge of the local and statewide activities of the relevant parties and the relationship of these activities to competition within the banking industry. It is nevertheless clear that the Board's determination was supported by substantial evidence in the record.

Petitioner's principal argument is that the Board's inquiry did not satisfy 12 U.S.C. § 1842(c), which forbids the Board from approving any proposed acquisition "whose effect in any section of the country may be substantially to lessen competition . . . unless it finds that the anticompetitive effects of the proposed transactions are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." Petitioner contends that the Board considered only the immediate effect upon competition and did not consider the future effects of the acquisition; thus, it argues reversal is required.

At the outset, we emphasize that Congress has recognized the special competency of the regulatory agencies to deal with matters within their jurisdiction. With respect to the procedures for the chartering of new banks and the problems that such applications raise, Congress has recognized the particular competence of the Board. The Board found that since New Bank was a *de novo* entrant into the relevant market, it would neither eliminate existing competition nor increase Bankshare's share of commercial bank deposits (R. 521–22, J.A. 348–49). The Supreme Court has stated that growth by internal expansion, *i. e., de novo* branching, is socially preferable to growth by merger. *United States v. Philadelphia National Bank,* 374 U.S. 321, 370, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The Board also found that the transaction would not have an adverse impact upon future competition between any of Bankshare's subsidiaries

and New Bank because of the distances between the banks and because of New Mexico's restrictive branch banking law (R. 522, J.A. 349). The Board found that the acquisition would stimulate competition in the relevant market by introducing a new banking alternative without adversely impacting any competing bank (*id.*). We conclude that the Board's findings on these matters are supported by substantial evidence.

The Board also found that the area around Las Cruces and not the entire state of New Mexico was the relevant market that should be considered (R. 522, J.A. 349). The choice of this market as being the relevant one cannot be set aside as not being based on substantial evidence. Finally, the Board found that, on balance, the acquisition would increase competition and decrease concentration in the area of Las Cruces, the relevant market (R. 522, 525; J.A. 349, 352). "The Board's particular competence to determine whether a bank holding company acquisition will have substantial anticompetitive effects has been recognized by Congress and accepted by the courts." *North Hills Bank v. Board of Governors of Federal Reserve System,* 506 F.2d 623, 625 (8th Cir. 1974); *Grandview Bank & Trust Co. v. Board of Governors of Federal Reserve System, supra,* at 421. The Board's conclusions and the evidence in the record supporting those findings provide an adequate basis to reject petitioner's contention that the Board did not give adequate consideration to the future effects of the acquisition.[10] While the Board might have been more precise in the findings it did make as to the future impact of New Bank on competition, there is nothing to indicate that the Board's references to this issue did not go as far into the future as one could reasonably be expected to go when evaluating the future development of a completely new bank.

Moreover, 12 U.S.C. § 1842(c)(2), the relevant statute, does not impose a *per se* rule but instead allows the Board to balance anticompetitive impact against the effect of the transaction in serving both the needs and convenience of the community and the public interest. We cannot say that the Board abused its discretion in deciding that the benefits of Bankshare's acquisition justified approving it. In short, in each of its examinations, the Board was supported by the data it cited reflecting market shares in Las Cruces, and in record evidence concerning the types of services to be provided by New Bank. *See First State Bank of Clute v. Board of Governors of Federal Reserve System,* 553 F.2d 950 (5th Cir.).

The Board also considered petitioner's argument that the acquisition of New Bank by Bankshare would violate New Mexico's branch banking laws. Based on substantial evidence, the Board concluded that it would not (R. 523–25, J.A. 350–52).

Since we conclude that substantial evidence supports the Board's findings, we affirm its decision.

*So ordered.*

---

**10.** The record contained, *inter alia,* Bankshare's application which included a statement of projected deposits for the first three years of operation of New Bank, and the methodology for arriving at such figures (R. 22–31; J.A. 15–26).